**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 9, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-20173

WILLIAM MARTINEZ; FRANK DITTA; and LAFAYETTE KIRKSEY,

Plaintiffs-Appellants,

versus

SCHLUMBERGER, LTD.; and SCHLUMBERGER TECHNOLOGY CORP.,

Defendants-Appellees.

Appeal from the United States District Court
For the Southern District of Texas

Before HIGGINBOTHAM, EMILIO M. GARZA, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case presents the question whether the Employee Retirement Income Security Act of 1974 ("ERISA")[1] imposes upon a company that acts as administrator of its employee benefit program a duty to truthfully disclose, upon inquiry from plan participants or beneficiaries, whether it is considering amending the benefit plan. Although the majority of other circuits have already confronted this issue,[2] it is one of first impression for our

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] *See Wayne v. Pac. Bell*, 238 F.3d 1048, 1050-51, 1055 (9th

circuit. In line with the majority rule of other circuits, the district court concluded that such a duty does not arise until the company is "seriously considering" a plan change, and granted summary judgment for the defendant employer based on its conclusion that the employer was not seriously considering the plan change at the time the employee plaintiffs inquired about whether the company intended to amend the benefit program. We affirm, although for reasons different from those relied upon by the district court.

**I.**

William Martinez, Frank Ditta, and Lafayette Kirksey, long-time employees of Schlumberger Ltd. and Schlumberger Technology Corp., collectively "Schlumberger," took early retirement effective July 1, 1998. Prior to July 1, each had asked personnel representatives at Schlumberger whether the company planned to implement an enhanced retirement incentive program, and personnel told them that they knew nothing about a new plan. However, only a month after their retirement, on July 27, 1998, Schlumberger announced a new voluntary early retirement plan, or "VERP," that provided an additional year of salary not included in the old VERP

Cir. 2001); *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122-26 (2d Cir. 1997); *Vartanian v. Monsanto Co.* (*Vartanian II*), 131 F.3d 264, 268 (1st Cir. 1997); *Hockett v. Sun Co.*, 109 F.3d 1515, 1522 (10th Cir. 1997); *McAuley v. Int'l Bus. Machs. Corp.*, 165 F.3d 1038, 1043-45 (6th Cir. 1999); *Fischer v. Phila. Elec. Co.* (*Fischer II*), 96 F.3d 1533, 1538-44 (3d Cir. 1996); *Wilson v. S.W. Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir. 1995); *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991).

under which the plaintiffs retired. Because they had terminated their employment with Schlumberger prior to July 27, 1998, they were ineligible for the additional benefits of the new VERP.

The plaintiffs sued Schlumberger in Texas state court for fraud, fraudulent inducement, negligence, and gross negligence, alleging that Schlumberger had falsely told each of them that no new VERP was under consideration before they separately elected to take early retirement. Schlumberger removed the suit to federal court and then moved for summary judgment, arguing that ERISA preempted the plaintiffs' claims. The plaintiffs conceded that ERISA preempted their state law causes of action, but argued that the court should construe their claims as alleging breach of fiduciary duty under ERISA.

Considering the suit as one for breach of fiduciary duty, the trial court reasoned that a company need not truthfully disclose the fact that it is considering adopting a plan change unless it is "seriously considering" such a change. This does not occur until three criteria are present: There is (1) a specific proposal (2) that is being discussed for purposes of implementation (3) by senior management with the authority to implement the change. The district court concluded that Schlumberger did not begin seriously considering the plan change until a few weeks after the last of the plaintiffs had inquired about a possible change, and granted

3

summary judgment in Schlumberger's favor.[3]  The plaintiffs have

_____

[3] The evidence presented along with Schlumberger's summary judgment motion reveals that on May 13, 1998, apparently at Schlumberger's request, the Segal Company sent Margaret Bailey, manager of benefit plan compliance at Schlumberger, a letter informing her of "the features and challenges" of using an early retirement incentive program.  It described the most common types of these programs, legal implications of utilizing such programs, and factors that are generally considered in estimating the cost of such programs.  The letter also informed Bailey that Segal "ha[d] begun preparing costs" for several different types of programs "for each company in the oilfield group" of Schlumberger.
     The following week, on May 21, 1998, Segal addressed another letter to Bailey providing the estimated expense for four different types of program designs.  Five days later, on May 26, 1998, Segal sent Bailey another letter supplementing the May 21 letter.  It calculated costs for two additional types of programs.
     On that same day, Bailey sent an e-mail to Pierre Bismuth, vice president of personnel, in which she attached the financial calculations for these two additional options, along with an estimation of the number of employees eligible for these programs.  Bismuth immediately wrote back, stating, "I will certainly go with the least aggressive option as the number[s] are high and the cost not [i]nsignificant ... [T]he aggressive options ... are too costly and not interesting.... [A]gain the cost makes me have second thoughts[.]"  On June 6, 1998, Bailey sent Bismuth additional calculations, this time for four different early retirement scenarios.
     On June 5, 1998, Art Alexander, senior advisor to Bismuth, sent an e-mail to Ken Rohner, director of personnel, explaining, "I know that we have used [S]egal to do the calculations involved in [early retirement program] considerations but there is doubtless another area of outside expertise that we should seek BEFORE a decision is made to proceed.  That is ERISA legal support since the area of obtaining ADEA (age discrimination) releases in [early retirement] Window circumstances is very tricky, relates to the amount of consideration being provided people and is influenced by court decisions and precedents."  He advised Rohner of the attorney he should call regarding these matters and added, "I don't know that he has yet been in the loop but I would think he should be pretty soon."
     On June 7, 1998, Bismuth wrote to Rohner, Alexander, and Bailey, "please make sure that [A]rt comes fully prepared in [P]aris to talk about it," and asked about "cost estimation" and additional "proposed incentives" for certain people he hoped to target with the program.  On July 14, 1998, Rohner, Bailey, Schlumberger Oilfield Services president Rex Ross, inside counsel

4

timely appealed.

## II.

We review a grant of summary judgment *de novo*, applying the same standards as the district court.[4]  Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[5] The moving party bears the burden of identifying an absence of evidence to support the nonmoving party's case.[6]  In determining whether summary judgment is appropriate, we must view all of the evidence introduced and all of the factual inferences from the evidence in a light most favorable to the party opposing the motion, and resolve all reasonable doubts about the facts in favor

---

John Symington, and other executives met at Sugar Land, Texas, and agreed upon a proposed plan that they then forwarded to other executives in the company, including Bismuth.  On July 27, 1998, Schlumberger made the VERP announcement to its employees.

When deposed, Bailey testified that "[n]either a final VERP plan nor a final recommendation was completed for presentation to upper management until July 14, 1998" at the Sugar Land meeting. "At this meeting, a more specific plan was then formalized and approved by those in attendance and forwarded to Pierre Bismuth for final approval."  She confirmed that "[o]nly the combined approval of" Bismuth and Ross "was sufficient to approve such a plan and result in its recommendation to the board of directors."

[4] *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

[5] *Id.;* FED. R. CIV. P. 56(c).

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

5

of the nonmoving party.[7]

## III.

## A.

It is well-known that Congress enacted ERISA to protect employees' rights to benefits while also encouraging employers to develop employee benefits programs.[8]  To that end, ERISA provides a "broad federal regulatory scheme governing the operation of privately sponsored employee benefit plans."[9]  Its fiduciary duty and reporting and disclosure requirements are crucial components of this scheme.[10]  In regard to reporting and disclosure, ERISA provides specific rules governing the information that must be provided to participants and beneficiaries as well as to certain government agencies.[11]

The summary plan description is one of the central ERISA disclosure requirements.[12]  A plan administrator must provide a

---

[7] *Terrebonne Parish Sch. Bd.*, 310 F.3d at 877.

[8] Melissa Elaine Stover, Note, *Maintaining ERISA's Balance: The Fundamental Business Decision v. the Affirmative Fiduciary Duty to Disclose Proposed Changes*, 58 WASH. & LEE L. REV. 689, 690 (2001) (citing 263 CONG. REC. S15,762 (1974)).

[9] Edward E. Bintz, *Fiduciary Responsibility Under ERISA: Is There Ever a Fiduciary Duty to Disclose?*, 54 U. PITT. L. REV. 979, 979 (1993).

[10] *Id.* at 980; *see* 29 U.S.C. §§ 1104-05, 1021-31.

[11] Bintz, *supra* note 9, at 980.

[12] *Id.* at 981.

summary plan description to an individual within ninety days of his or her becoming a participant.[13] The description must be written in a manner "calculated to be understood by the average plan participant" and must be "sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan."[14] ERISA also mandates that administrators provide a summary description of any material plan modification within 210 days after the end of the plan year in which the change was adopted.[15]

Apart from the ERISA disclosure rules plan administrators are also subject to fiduciary duties.[16] Section 404(a)(1) of ERISA incorporates strict standards of trustee conduct, derived from the common law of trusts, including a standard of loyalty and a standard of care:

> Under the former, a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries ... and ... defraying reasonable expenses of administering the plan." Under the latter, a fiduciary "shall discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a

---

[13] *Id.;* 29 U.S.C. § 1024(b)(1); 29 C.F.R. § 2520.104-4(b)(1).

[14] 29 C.F.R. § 2520.102-2.

[15] 29 U.S.C. § 1024(b)(1)(B).

[16] 29 U.S.C. § 1104(a)(1).

7

like character and with like aims."[17]
Other than including these general dictates, ERISA does not expressly enumerate the particular duties of a fiduciary, but rather "relies on the common law of trusts to define the general scope of a fiduciary's responsibilities."[18]  As a result, "[t]he express language of ERISA provides little indication as to whether there is ever a fiduciary duty to disclose information to participants and beneficiaries," and "[n]either ERISA's fiduciary duty nor reporting and disclosure rules directly address the relationship between" one another.[19]

Although trust principles impose a duty of disclosure upon an ERISA fiduciary when there are "'material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know'" but "'needs to know for his protection,'"[20] this does not answer the question whether an employer-administrator has a duty to disclose *potential*, as opposed to *current*, benefit plan provisions.  The question is complicated by the fact that ERISA allows an employer to act as a plan administrator, leaving open the potential that the employer could

---

[17] *Cent. States, S.E. & S.W. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570-71 (1985) (quoting § 1104(a)(1)).

[18] Bintz, *supra* note 9, at 985.

[19] *Id.* at 988.

[20] *Id.* at 985 (quoting RESTATEMENT (SECOND) OF TRUSTS § 173 cmt. d (1959)).

8

be subject to conflicting loyalties in such a situation: "A loyalty to do what is in the best interest of the company, and a fiduciary duty of loyalty to do what is in the best interest of the [participants and beneficiaries]."[21] As the Supreme Court has noted, although a traditional trustee "is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries[, u]nder ERISA ... a fiduciary may have financial interests adverse to beneficiaries."[22] Thus, employers "can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (*e.g.,* firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (*e.g.,* modifying the terms of a plan as allowed by ERISA to provide less generous benefits)."[23]

To assist in resolving this potential conflict, the Supreme Court created the "two hats" doctrine, which acknowledges that the employer is subject to fiduciary duties under ERISA only "to the extent" that it performs three specific functions identified by Congress:[24] (i) exercising "any discretionary authority or discretionary control respecting management of [a benefits] plan or

---

[21] Stover, *supra* note 8, at 690.

[22] *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (internal quotation marks and citation omitted).

[23] *Id.*

[24] Stover, *supra* note 8, at 698 n. 44, 714–19.

exercis[ing] any authority or control respecting management or disposition of its assets"; (ii) rendering "investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan," or having "any authority or responsibility to do so"; or (iii) having "any discretionary authority or discretionary responsibility in the administration of" the plan.[25] Therefore, in suits charging breach of fiduciary duty under ERISA, "the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."[26]

**B.**

"A plan participant may bring suit for breach of fiduciary duty to obtain 'appropriate equitable relief' to redress violations of ERISA."[27] Although we have not yet addressed whether ERISA imposes a fiduciary duty upon an employer to truthfully disclose, upon inquiry, its consideration of a benefit plan change,[28] most of

---

[25] 29 U.S.C. § 1002(21)(A).

[26] *Pegram*, 530 U.S. at 226.

[27] *McCall v. Burlington N./Santa Fe Co.*, 237 F.3d 506, 510 (5th Cir. 2000).

[28] *McCall* presented us with the question, but we declined to address it in that case because the plan change at issue was not conceived until several years after the plaintiffs decided to

10

our sister circuits have, these decisions together creating what one commentator has characterized as a "continuum of disarray."[29] Before visiting these decisions, however, we note that the Supreme Court, while not having spoken on this precise question, has defined in general terms an employer's responsibility to communicate truthfully with its employees regarding the future of benefit plans.

In *Varity Corp. v. Howe*, plaintiffs, past employees of Varity's subsidiary, Massey-Ferguson Inc., complained that Varity had affirmatively misrepresented to them that their benefits would remain secure if they transferred to a new subsidiary, Massey Combines.[30] Before their transfer, the plaintiffs participated in Massey-Ferguson's self-funded employee welfare benefit plan, an ERISA-protected plan.[31] Varity, Massey-Ferguson's parent company,

---

retire. *Id.* at 511 n.2 ("The Fifth Circuit has not yet set out the boundaries of a fiduciary's legal obligation to truthfully inform employees about possible future employee benefit plans. Seven of our sister circuits have held that there is no breach of fiduciary duty in failing to inform beneficiaries about a future plan until and unless that plan is under 'serious consideration.' The Second Circuit, on the other hand, declined to treat serious consideration as a 'talismanic' indicator, but listed it as one factor in the materiality inquiry.... Finding the question not properly presented, we decline the parties' invitation to adopt or reject the 'serious consideration' test for the Fifth Circuit." (internal citations omitted)).

[29] Daniel M. Nimtz, *ERISA Plan Changes*, 75 Denv. U. L. Rev. 891, 894 (1998).

[30] 516 U.S. 489 (1996).

[31] *Id*. at 492.

became concerned that Massey-Ferguson was losing too much money and developed a business plan to deal with the problem.[32] The plan called for "a transfer of Massey-Ferguson's money-losing divisions, along with various other debts, to a newly created, separately incorporated subsidiary called Massey Combines."[33] The plan contemplated that Massey Combines would fail, but viewed this probable occurrence in a favorable light, because the failure "would not only eliminate several of Varity's poorly performing divisions, but .. would also eradicate various debts that Varity would transfer to Massey Combines, and which, in the absence of the reorganization, Varity's more profitable subsidiaries or divisions might have to pay."[34]

One of the obligations Varity desired to eliminate was the Massey-Ferguson benefit plan's promises to pay the medical and other nonpension benefits to employees of Massey-Ferguson's money-losing divisions.[35] To accomplish this goal Varity held a special meeting with employees of the failing divisions in an attempt to convince them to switch over to Massey Combines.[36] At the meeting Varity promised that "the employees' benefits would

---

[32] *Id.* at 492-93.

[33] *Id.* at 493.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 494.

12

remain secure" if they transferred to Combines, even though "Varity knew ... the reality was very different."[37]  Approximately 1500 Massey-Ferguson employees accepted Varity's assurances and transferred to Combines; by the end of Combines' second year the company was in receivership, and the employees lost their nonpension benefits.[38]

In determining whether Varity had breached any fiduciary duty owed the plaintiffs, the Supreme Court first recognized that ERISA protects employee benefit plans by setting forth certain fiduciary duties applicable to their management.[39]  Although these duties find their basis in the common law of trusts,[40] the Court cautioned that ERISA's standards and procedural protections "partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection."[41]  In some instances "trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements."[42]  In so doing, courts should take

---

[37] *Id.*

[38] *Id.*

[39] *Id.* at 496.

[40] *Id.*

[41] *Id.* at 497.

[42] *Id.*

13

account of competing congressional purposes, "such as Congress'[s] desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place."[43]

In terms of an employer's fiduciary status, the Court found that ERISA raises an employer to the status of fiduciary "'to the extent'" that it "'exercises any discretionary authority or discretionary control respecting management'" of the plan, or has "'any discretionary authority or discretionary responsibility in the administration'" of the plan.[44] Varity argued that "when it communicated with its Massey-Ferguson workers about transferring to Massey Combines, it was not administering or managing the plan; rather, it was acting only in its capacity as an *employer* and not as a *plan administrator*."[45] The Court disagreed, finding that the purpose of the meeting convened by Varity was to convey that transferring to Combines "would not significantly undermine the security of their benefits" and therefore Varity was acting "in its

---

[43] *Id*.

[44] *Id*. at 498 (quoting 29 U.S.C. § 1002(21)(A)) (internal quotation marks omitted).

[45] *Id*.

14

capacity as plan administrator."[46]

In making this determination the Court explained that "we must interpret the statutory terms which limit the scope of fiduciary activity to discretionary acts of plan 'management' and 'administration.'"[47]  It then reasoned that

> [t]he ordinary trust law understanding of fiduciary "administration" of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents. The law of trusts also understands a trust document to implicitly confer such powers as are necessary or appropriate for the carrying out of the purposes of the trust.[48]

It concluded, "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose."[49]

The Court emphasized that in convening the meeting and providing the employees with reassurances about the security of their future benefits, "Varity was exercising 'discretionary authority' respecting the plan's 'management' or 'administration' when it made these misrepresentations."[50]  Varity argued that

---

[46] *Id*. at 501.

[47] *Id*. at 502.

[48] *Id*. (internal quotation marks omitted).

[49] *Id.*

[50] *Id.* at 498.

"neither the specific disclosure provisions of ERISA, nor the specific terms of the plan instruments *required* it to make these statements," so it could not have taken on a fiduciary status in making them.[51] However, the Court explained that the fiduciary duty primarily functioned "to constrain the exercise of *discretionary* powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose."[52]

After concluding that Varity acted as a fiduciary during the meeting with prospective Combines employees, the Court determined that the company breached its fiduciary duty by affirmatively misleading the employees about the future of their benefits if they were to transfer.[53] It explained that ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."[54] It then reasoned, "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act solely in the interest of the participants and beneficiaries .... [L]ying is

---

[51] *Id.* at 504.

[52] *Id.*

[53] *Id.* at 506.

[54] *Id.* (internal quotation marks omitted).

16

inconsistent with the duty of loyalty owed by all fiduciaries .... "[55] The *Varity* Court concluded, "we can find no adequate basis ... for any special interpretation [of ERISA's fiduciary duty] that might insulate Varity, acting as a fiduciary, from the legal consequences of the kind of conduct (intentional misrepresentation) that often creates liability even among strangers."[56]

Although the *Varity* Court explicitly declined to take up "whether ERISA fiduciaries have any fiduciary duty to disclose truthful information ... in response to employee inquiries,"[57] its reasoning does provide insight. Important for our purposes is the acknowledgment that ERISA's disclosure requirements do not themselves mandate that an employer disclose information regarding the future of a benefit plan. Indeed, the Court characterized this act as "discretionary." Justice Thomas, writing for the dissenters, similarly reminded that ERISA "impose[s] a comprehensive set of reporting and disclosure requirements, which is part of an elaborate scheme ... for enabling beneficiaries to learn their rights and obligations at any time."[58] However, "no provision of ERISA requires an employer to keep plan participants

---

[55] *Id.* (internal quotation marks omitted).

[56] *Id.*

[57] *Id.*

[58] *Id.* at 531 (Thomas, J., dissenting) (internal quotation marks omitted).

abreast of ... the sponsor's future intentions with regard to terminating or reducing the level of benefits."[59]

Of equal importance is the majority's view that even if disclosure of a plan's future is discretionary, once an employer chooses to exercise its discretionary authority by informing the employees of the future status of a benefit plan, it acts as a fiduciary and thus has a duty not to misrepresent the truth, which would be inconsistent with the duty to act "solely in the interests of the participants and beneficiaries."

## c.

The earliest court of appeals case addressing the fiduciary obligations of an employer considering implementing an enhanced benefits plan is *Berlin v. Michigan Bell Telephone Co.*, a 1988 case from the Sixth Circuit.[60] Michigan Bell offered a retirement incentive program, and then a more generous second plan. During the first offering, the company attempted to dispel rumors that it planned to offer a second, enhanced program if not enough employees accepted the first time around. To that end it indicated that the first offering was a "one-time application, that [enhanced] benefits would not again be made available, and that managers considering retirement should not delay plans in anticipation of

---

[59] *Id.* at 531–32.

[60] 858 F.2d 1154, 1164 (6th Cir. 1988).

another [early retirement] offering."[61]  Plaintiffs, who accepted the first offering, contended that the company intentionally misrepresented the possibility of a second, more beneficial program.[62]

In determining whether the company violated any fiduciary duty in making the misleading statements, the court first acknowledged that several courts have "held that misleading communications to plan participants regarding plan administration," for instance, "eligibility under a plan" or "the extent of benefits under a plan," may "support a claim for breach of fiduciary duty."[63]  It distilled these holdings into the principle that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence [under ERISA] are owed."[64]

Based on this conclusion the *Berlin* court reasoned that "when serious consideration was given by" the company to implementing the second offering, the plan administrator "had a fiduciary duty not to make misrepresentations, either negligently or intentionally, to potential plan participants concerning the second offering."[65] Consequently, "any misrepresentations made to the potential plan

---

[61] *Id.* at 1158.

[62] *Id.*

[63] *Id.* at 1163.

[64] *Id.*

[65] *Id.* at 1163-64.

participants after serious consideration was given to a second offering could constitute a breach of a fiduciary duty."[66]  It dismissed the company's defense, that it could not have made misrepresentations prior to its final decision to offer the enhanced benefits because "any pre-decision communications [could] be nothing more than predictions," by concluding that "this distinction goes to materiality rather than to the definition of 'misrepresentation.'"[67]  It reasoned that if, for example, the company, "after *serious consideration*" of a second benefits offering began, represented that the enhanced plan was not being considered, such a statement "would be characterized as a material misrepresentation, although no final decision had been made."[68]

In finding that the company could be liable for breach of fiduciary duty because of its alleged misrepresentations, the *Berlin* court limited its ruling to those instances in which employers are accused of affirmatively misrepresenting the possibility of future benefits:

> [P]laintiffs are not arguing, nor do we hold, that defendants had any duties ... to say anything at all or to communicate with potential plan participants about the future availability of [enhanced retirement benefits programs].... But if the plan administrator and/or plan fiduciary does communicate with potential plan participants *after serious consideration* has been given

---

[66] *Id.* at 1164.

[67] *Id.* at 1164 n.7.

[68] *Id.*

20

concerning a future implementation or offering under the plan, then any material misrepresentations may constitute a breach of their fiduciary duties.[69]

*Berlin* thus carved out a limited duty on the part of employers to avoid misrepresentations about the availability of future incentive programs *if* they choose to broach the subject of prospective plans.  It did not hold that the employer had an affirmative duty to communicate any information about future plans to its employees, either before or after it gave serious consideration to those potential programs.  Although reasoning that an employer could be liable for misrepresentations after the point at which it began seriously considering a plan change, the court provided no definition for the term nor an explanation for its drawing the line at the point of "serious consideration" rather than at another point during the process of adopting a plan change.[70]

The Sixth Circuit expanded upon *Berlin* three years later in *Drennan v. General Motors Corp.*, in which it held that the duty to avoid material representations about a future plan requires that an employer also "fairly disclose[] the progress of its serious

_____

[69] *Id.* at 1164.

[70] Several other circuit courts followed *Berlin* in finding that an employer may not affirmatively misrepresent potential benefits. *See, e.g.*, *Maez v. Mountain States Telephone & Telegraph, Inc.*, 54 F.3d 1488, 1501 (10th Cir. 1995); *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668-69 (2d Cir. 1994); *Vartanian v. Monsanto Co.* (*Vartanian I*), 14 F.3d 697, 702 (1st Cir. 1994); *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991).

considerations to make a plan available to affected employees."[71]

It transformed *Berlin*'s prohibition against misrepresentation into

an affirmative duty of truthful disclosure:

> A fiduciary "has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship."  A fiduciary must give complete and accurate information in response to participants' questions, a duty that does not require the fiduciary to disclose its internal deliberations nor interfere with the substantive aspects of the [collective] bargaining process.[72]

As one commentator has noted, *Drennan*'s statements are "somewhat

contradictory," and reconciled they appear to require a fiduciary

---

[71] 977 F.2d 246, 251 (6th Cir. 1992).

[72] *Id.* at 251 (quoting *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C. Cir. 1990)).  Although the statement *Drennan* lifts from *Eddy* appears to support *Drennan*'s proposition that an employer must disclose potential plan changes that might affect the future of a participant's benefits, *Eddy* actually concerned an entirely different set of circumstances.  In that case the plaintiff, a participant in his employer's group health insurance policy who suffered from AIDS, received notice that after a certain date his group coverage would terminate.  919 F.2d at 748.  The district court concluded that when Eddy called the insurance company to attempt to prolong his health coverage, he asked whether it could be "continued" rather than whether it could be "converted."  The insurance representative told him it could not be continued.  *Id.* at 748-49.  The district court found that the insurance company breached no duty to Eddy because it had truthfully informed him that his coverage could not be continued.  *Id.* at 749.  The circuit court reversed, finding that the insurance provider's duty encompassed more than simply informing Eddy that his coverage could not be continued, but also explaining to him that his group policy could be converted into an individual one.  *Id.* at 750-52.  Thus, the case concerned an insurer's responsibility to communicate fully a beneficiary's rights under his current insurance coverage.  It did not speak to whether an employer-administrator has a duty to fully disclose the status of its consideration of future plan amendments.

22

to disclose the fact that changes to a plan are under consideration "but not the details of the decision-making process."[73]

Although *Drennan* added to the holding of *Berlin* by insisting upon an affirmative duty on the part of an employer, *Wilson v. Southwestern Bell Telephone Co.,* an Eighth Circuit case released after *Drennan*, adhered to *Berlin*'s more restrictive definition of an employer's duty to its employees with respect to a potential plan change.[74]  The *Wilson* panel explained that while "[p]lan fiduciaries are *not* obligated under ERISA to provide information to potential plan beneficiaries about possible future offerings," if a fiduciary does choose to "provide such information about the future ... it has a duty not to make misrepresentations about any future offering."[75]  For instance, "[a] statement to employees that future incentive programs are not planned can be a misrepresentation if serious consideration has been given to implementing a future program."[76]

Although the Eighth Circuit preferred to adhere to *Berlin*, the Third Circuit took its cues from *Drennan*, holding that an employer has both a negative duty to refrain from disseminating incorrect information with regard to potential plans under serious

---

[73] Bintz, *supra* note 9, at 995.

[74] 55 F.3d 399, 405 (8th Cir. 1995).

[75] *Id*. (citing *Berlin*, 858 F.2d at 1164) (emphasis added).

[76] *Id.*

consideration, and an affirmative responsibility to disclose, upon an employee's request, the terms of such a plan if it is under serious consideration.[77] That court further created a three-part test for discerning whether a potential plan is under serious consideration.[78] These developments occurred in two decisions in the same case, *Fischer v. Philadelphia Electric Co.*[79] The plaintiffs, past employees of Philadelphia Electric, had retired soon before the utility had implemented an early retirement incentive program.[80] Prior to their retirement, the plaintiffs had inquired of the company whether it would be pursuing such a program but benefits counselors had told them that no new plan was being considered.[81] They filed suit alleging that the utility had breached its fiduciary obligation to reveal to them when asked that it had been considering an early retirement incentive program.[82]

The district court granted summary judgment in the utility's favor and the plaintiffs appealed.[83] The Third Circuit issued its

---

[77] *Fischer v. Phila. Elec. Co.* (*Fischer II*), 96 F.3d 1533 (3d Cir. 1996); *Fischer v. Phila. Elec. Co.* (*Fischer I*), 994 F.2d 130 (3d Cir. 1993).

[78] *Fischer II*, 96 F.3d at 1539.

[79] *Fischer II*, 96 F.3d 1533; *Fischer I*, 994 F.2d 130.

[80] *Fischer I*, 994 F.2d at 132.

[81] *Id.*

[82] *Id.*

[83] *Id.*

first decision, known as *Fischer I*, relying on *Drennan* for guidance.[84] It concluded that although an ERISA fiduciary "is under no obligation to offer precise predictions about future changes to its plan," it "may not make affirmative material misrepresentations" and must "answer participants' questions forthrightly."[85] Perpetuating the internal contradiction first established in *Drennan*, it added that this duty of disclosure does not, however, "require the fiduciary to disclose its internal deliberations nor interfere with the substantive aspects of the [collective] bargaining process."[86]

It also expanded upon *Drennan* by defining the term "material misrepresentation," reasoning that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire."[87] It continued:

> Included within the overall materiality inquiry will be an inquiry into the seriousness with which a particular change to an employee pension plan is being considered at the time the misrepresentation is made. All else equal, the more seriously a plan change is being considered, the more likely a misrepresentation, e.g., that no change is under consideration, will pass the threshold of

---

[84] *Id.* at 135.

[85] *Id.*

[86] *Id.* (internal quotation marks omitted).

[87] *Id.*

materiality.[88]

The court remanded the case on the basis that fact questions remained on the issue of how seriously the defendant was considering the early retirement program when the plaintiffs made the various inquiries that elicited the alleged misrepresentations.[89]

In *Fischer II* the Third Circuit had a second chance to speak on the serious consideration issue.[90] After the circuit court's remand in *Fischer I*, the district court had determined that the defendants were liable to those plaintiffs who had inquired about the possibility of a new plan between the time the utility's manager of compensation and benefits started exploring the idea of an early retirement plan – the point at which "serious consideration" began – and the date on which the plan was announced.[91] The defendants appealed and the Third Circuit reversed, explaining that the district court had "misunderstood the concept of 'serious consideration.'"[92]

It explained, "[i]n the current case, as in any case where the misrepresentation in question is the statement that no change in

---

[88] *Id.*

[89] *Id.*

[90] 96 F.3d 1533 (3d Cir. 1996).

[91] *Id.* at 1536–38.

[92] *Id.* at 1536.

benefits is under consideration, the only factor at issue is the degree of seriousness with which the change was in fact being considered. This factor controls the materiality test."[93] Supplying a belated justification for *Fischer I*'s use of *Drennan*'s "serious consideration" standard, the *Fischer II* panel opined:

> The concept of "serious consideration" recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis. Every business must develop strategies, gather information, evaluate options, and make decisions. Full disclosure of each step in this process is a practical impossibility. Moreover ... large corporations regularly review their benefits packages as part of an on-going process of cost-monitoring and personnel management. The various levels of management are constantly considering changes in corporate benefits plans. A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities. Consequently, our holding in *Fischer I* requires disclosure only when a change in benefits comes under *serious* consideration.
> Equally importantly, serious consideration protects employees. Every employee has a need for material information on which that employee can rely in making employment decisions. Too low a standard could result in an avalanche of notices and disclosures. For employees at a company ... which regularly reviews its benefits plans, truly material information could easily be missed if the flow of information was too great. The warning that a change in benefits was under serious consideration would become meaningless if cried too often.[94]

Attempting to transform the nebulous concept of "serious consideration" into a standard courts could actually apply, the *Fischer II* court created a three-factor test: "Serious

---

[93] *Id.* at 1538.

[94] *Id.* at 1539.

27

consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with authority to implement the change."[95] These criteria "interact and coalesce to form a composite picture of serious consideration."[96]

The court explained that the first factor "distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options."[97] This factor does not require, however, that the proposal describe the plan in its final form.[98] Rather, "a specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal," as long as the proposal is "sufficiently concrete to support consideration by senior management for the purpose of implementation."[99]

The second element, discussion for implementation, "distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy," and "protects the ability of senior management to take a role in the early phases of the

---

[95] *Id.*

[96] *Id.*

[97] *Id.* at 1539-40.

[98] *Id.* at 1540.

[99] *Id.*

28

process without automatically triggering a duty of disclosure."[100] The final criterion, consideration by senior management with authority to implement the change, "ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy."[101] In other words, until senior management with "authority to implement the proposed change" enters into the picture, "the company has not yet seriously considered a change."[102]

The *Fischer II* court reasoned that this formulation

> ensures that disclosures to employees about potential changes in benefits will be meaningful. Employees will learn of potential changes when the company's deliberations have reached a level where an employee should reasonably factor the potential change into an employment decision. This guarantees that employees will have the information they need, while avoiding a surfeit of meaningless disclosures. Finally, as a matter of policy, we note that imposing liability too quickly for failure to disclose a potential early retirement plan could harm employees by deterring [employers] from resorting to such plans.[103]

Only two months after the Third Circuit released *Fischer II*, the Sixth Circuit established its own standard for determining serious consideration. In *Muse v. International Business Machines Corp.*,[104] that court reasoned that "[t]he exception of serious

---

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 1541.

[104] 103 F.3d 490 (6th Cir. 1996).

consideration does not apply until a company focuses on a particular plan for a particular purpose."[105]  Despite *Muse*'s omission of any mention of *Fischer II* or the Third Circuit's three-pronged test, in a later case, *McAuley v. International Business Machines Corp.*, the Sixth Circuit decided to merge its "particular plan for a particular purpose" standard with *Fischer II*'s three-part serious consideration test.[106]

The Tenth and First Circuits later incorporated *Fischer II* into their jurisprudence on an employer's fiduciary duties. In *Hockett v. Sun Co.*, the Tenth Circuit held that "material misrepresentations about a future plan offering do not constitute a breach of fiduciary duty unless the misrepresentations are made after the employer has 'seriously considered' the future offering.... '*Serious* consideration' marks the point ... at which imposing fiduciary-related duties will best serve the competing congressional purposes."[107]  In its view, the *Fischer II* test

---

[105] *Id.*

[106] *McAuley v. Int'l Bus. Mach. Corp.*, 165 F.3d 1038, 1043–45 (6th Cir. 1999) ("[Under *Muse*] [s]erious consideration does not occur until a company focuses on a particular plan for a particular purpose.  The only further guidance *Muse* provides is to say that it is not serious consideration if an employer has only studied changes in plans to gain a general appreciation of its options.... [I]t is [also] useful to consider *Fischer II*, which delineated a relatively specific set of factors for determining serious consideration." (internal quotation marks and citations omitted)).

[107] *Hockett v. Sun Co.*, 109 F.3d 1515, 1522 (10th Cir. 1997).

"appropriately narrow[ed] the range of instances in which an employer must disclose, in response to employees' inquiries, its tentative intentions regarding an ERISA plan."[108]  It repeated the concern that plagued the *Fischer II* panel: "If *any* discussion by management regarding possible change to an ERISA plan triggered disclosure duties, the employer could be burdened with providing a constant, ever-changing stream of information to inquisitive plan participants,"[109] and would be forced to "impair the achievement of legitimate business goals by allowing competitors to know that the employer is considering a labor reduction, a site-change, a merger, or some other strategic move."[110]  It also noted that, were fiduciaries required "to disclose such a business strategy, it would necessarily fail.  Employees simply would not leave if they were informed that improved benefits were planned if workforce reductions were insufficient."[111]

Similarly, in *Vartanian v. Monsanto Co.* (*Vartanian II*), the First Circuit used the *Fischer II* test to define the extent of an employer's fiduciary duty to disclose prospective plan changes.[112]

---

[108] *Id.* at 1523.

[109] *Id.*

[110] *Id.* (internal quotation marks omitted).

[111] *Id.* (internal quotation marks and citation omitted).

[112] 131 F.3d 264, 268 (1st Cir. 1997).  *Vartanian II* also explained the evolution of case law on the issue of fiduciary duties prior to announcement of a new plan:

31

It modified the standard by requiring that the specific proposal being discussed for purposes of implementation by senior management be applicable to "a person in the position of the plaintiff."[113] Despite its use of the serious consideration test *Vartanian II* expressed certain reservations about the standard, acknowledging that if confronted with a "positive misrepresentation" on the part of an employer, the misrepresentation might be material "regardless of whether future changes are under consideration at the time the misstatement is made."[114]

The Second Circuit was the first to break from the serious consideration pack with *Ballone v. Eastman Kodak Co.*, holding that an employer could be liable for affirmatively misrepresenting the availability of a prospective retirement enhancement program regardless of whether the new plan was then under serious consideration.[115]   In *Ballone*, the employer-administrator had

---

Early decisions grappling with the employer's duties in this context focused mainly on the extent of the cause of action engendered by an employer's material misrepresentations regarding prospective changes in plan benefits.   As a consensus on that issue developed, attention began to shift to the question of when the consideration of a change in benefits reached a point of seriousness sufficient to trigger a fiduciary duty of disclosure.

*Id.* at 268-69 (citations omitted).

[113] *Id.* at 272.

[114] *Id.* at 269.

[115] 109 F.3d 117 (2d Cir. 1997).

allegedly made affirmative assurances to its employees that it would not adopt an enhanced pension plan in the months following the plaintiffs' retirement.[116] The district court granted summary judgment in Kodak's favor, finding it irrelevant that Kodak had allegedly promised the plaintiffs that it had ruled out future plan changes because Kodak was not seriously considering such a plan change at the time it made the assurance.[117] The Second Circuit reversed, rejecting the *Fischer II* court's conclusion that misrepresentations about future benefits do not become material until the employer seriously considers benefits program changes.[118] Instead, the *Ballone* court reasoned that "[w]hether a plan is under serious consideration is but one factor in the materiality inquiry," and no bright-line rule existed "that serious consideration of a future plan is a prerequisite to liability for misstatements regarding the availability of future pension benefits."[119] Rather, the court accepted "the simple view that when a plan administrator speaks, it must speak truthfully, regardless of how seriously any changes are being considered."[120]

Applying its truthfulness standard to the facts at hand,

---

[116] *Id.* at 120.

[117] *Id.*

[118] *Id.* at 122.

[119] *Id.* at 123.

[120] *Id.* (internal quotation marks omitted).

*Ballone* concluded that "Kodak may not actively misinform its plan beneficiaries about the availability of future retirement benefits to induce them to retire earlier than they otherwise would, regardless of whether or not it is seriously considering future plan changes. Kodak has a duty to deal fairly and honestly with its beneficiaries."[121] It looked to securities law for guidance in defining the materiality standard applicable to these misrepresentations, finding that "an assurance about the future that by necessary implication misrepresents present facts is clearly actionable,"[122] and such statements "are material if they would induce reasonable reliance."[123]

It expanded on this:

Determining the materiality of false assurances like those here alleged is fact-specific and will turn on a number of factors, including[] how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware, taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information; and the specificity of the assurance. Whereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where, as

---

[121] *Id.* at 124.

[122] *Id.*

[123] *Id.*

34

alleged here, the guarantee is supported by specific statements of fact.[124]

Although acknowledging that the extent to which a company is considering a new plan at the time it makes the alleged misrepresentation is relevant to its materiality, *Ballone* was unwilling to give the "special consideration" test talismanic significance, fearful of providing an employer-administrator "carte blanche to make statements that the employer knows to be false, or that have no reasonable basis in fact, simply because the statements concern the future."[125]

Taking the lead from *Ballone*, the Ninth Circuit, although adopting the *Fischer II* serious consideration test in the context of defining an employer's duty to affirmatively disclose in response to an employee's inquiry whether it is seriously considering a plan change, found that *Ballone* more accurately defines an employer's responsibility to not misrepresent future plan changes.[126] In *Bins v. Exxon*, the Ninth Circuit read *Varity* to suggest that an employer has a fiduciary duty to communicate information about the future of plan benefits, and concluded that *Fischer II* best accomplishes this goal while balancing the employer's interest in not being overly burdened by the

---

[124] *Id.* at 125 (citations omitted).

[125] *Id.* at 122, 126.

[126] *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042 (9th Cir. 2000) (en banc).

responsibility to communicate constantly the progress of its consideration of potential plans.[127] It emphasized, as did the *Fischer II* court, that the test "should not be applied so rigidly as to distract attention from the core inquiry, which must always be whether the employer-fiduciary has violated its fiduciary duty of loyalty to plan participants by failing to disclose material information."[128]

Then, in *Wayne v. Pacific Bell*, the Ninth Circuit clarified that the holding in *Bins* adopting the serious consideration test applied only to claims that employers breached their fiduciary duties not to disclose their consideration of a plan change.[129] In deciding a claim that an employer affirmatively misrepresented future plan benefits, the court found the *Ballone* rule more appropriate.[130] Thus, the Ninth Circuit has implemented a two-tiered approach to a company's fiduciary duty of disclosure.

## D.

This review of the evolution of the scope of an employer's duties regarding future plan changes, including the creation and proliferation of the "serious consideration" doctrine, suggests that we need address several interrelated issues: First, should we

---

[127] *Id.* at 1047-49.

[128] *Id.* at 1049.

[129] 238 F.3d 1048, 1050-51, 1055 (9th Cir. 2001).

[130] *Id.* at 1055.

find that an employer who chooses to speak about prospective plan changes has a fiduciary duty not to misrepresent those changes, and, if so, at what point does that duty arise – at the time the employer "seriously considers" the change, or some other time during the process. Second, should we also place upon the employer an affirmative obligation to disclose a future plan change, and, if so, at what point.

With respect to an employer's misrepresentations, we conclude, as have all of the circuits that have considered this issue, that an employer, if it chooses to communicate about the future of a participant's plan benefits, has a fiduciary duty to refrain from misrepresentations. The Supreme Court's words in *Varity* instruct that when an employer chooses, in its discretion, to communicate about future plan benefits, it does so as an ERISA fiduciary.[131] In speaking it is exercising discretionary authority in administration of the plan, a specifically enumerated fiduciary function under ERISA.[132] Thus, it has a duty to refrain from "knowingly and significantly" deceiving a plan's beneficiaries "in order to save the employer money at the beneficiaries' expense," which would be inconsistent with its fiduciary responsibility to act "solely in the interest of the participants and beneficiaries."[133] This is

---

[131] *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

[132] *See id.* at 504-05.

[133] *Id.* at 506 (internal quotation marks omitted).

consistent with our defining of the scope of an employer's fiduciary duties: In *McCall* we reasoned that "[p]roviding information to beneficiaries about likely future plan benefits falls within ERISA's statutory definition of a fiduciary act. When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of the plan, it must speak truthfully."[134]

Although we join our sister circuits in recognizing this duty, we cannot agree that misrepresentations are actionable only after the company has seriously considered the plan change. *Varity* does not suggest that the obligation not to misrepresent materializes near the end of a progression, but rather implies that whenever an employer exercises a fiduciary function, it must speak truthfully. Nor do we find a safe harbor for predictions of the future. When an employer speaks to the future of a plan, employees are justified in concluding that it is backed by the authority of a plan administrator, and should therefore be entitled to trust in those representations.

Accordingly, we reject the view that the duty to speak truthfully only arises once the employer begins seriously considering a plan. We see no reasoned justification for drawing the line at that point in time. We also decline to find, as did

---

[134] *McCall v. Burlington N./Santa Fe Co.*, 237 F.3d 506, 510 (5th Cir. 2000).

the *Fischer II* court, that a misrepresentation is only material, and therefore actionable, once the company has seriously considered the plan change. This view does not comport with the Supreme Court's dictates, in the related context of securities law,[135] that materiality is a fact-specific inquiry not capable of easy line-drawing.

In *Basic Inc. v. Levinson*, the Court rejected a bright-line approach to materiality similar to the "serious consideration" test.[136] Beginning in September 1976, Basic had engaged in meetings with another company, Combustion, regarding the possibility of a merger.[137] During 1977 and 1978, Basic issued three public statements denying that it was engaged in merger negotiations.[138] In late 1978, Basic announced its approval of Combustion's tender offer for all of its outstanding shares.[139]

Plaintiffs, former Basic shareholders who sold their stock after Basic's first public denial but before the merger, argued that the defendants had issued three false or misleading public

---

[135] The *Ballone* court looked to securities law for assistance in defining the materiality inquiry in ERISA breach of fiduciary duty cases. *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 124 (2d Cir. 1997).

[136] 485 U.S. 224 (1988).

[137] *Id.* at 227.

[138] *Id.*

[139] *Id.* at 228.

statements in violation of § 10(b) of the Securities Act and Rule 10b-5.[140]  They averred that they were injured by selling Basic shares at artificially depressed prices in a market affected by their reliance upon the defendants' misleading statements.[141]

The district court granted summary judgment for the defendants, holding that any misrepresentations were immaterial as a matter of law since any negotiations taking place when the statements were issued were not destined with reasonable certainty to become a merger agreement.[142]  The Sixth Circuit reversed, reasoning that while the defendants were under no general duty to disclose their discussions with Combustion, any statement the company voluntarily released could not be so incomplete as to mislead.[143]  It rejected the argument that preliminary merger discussions were immaterial as a matter of law, and held that once a statement is made denying the existence of any discussions, even discussions that might not have been material in the absence of the denial are material because they make the statement made untrue.[144]

The Supreme Court began its discussion of materiality by reiterating its prior statement that, under the securities laws,

---

[140] *Id.*

[141] *Id.*

[142] *Id.* at 228–29.

[143] *Id.* at 229.

[144] *Id.*

"[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in" his decision.[145]   It recognized that "certain information concerning corporate developments could well be of dubious significance," and that too low of a standard might "bring an overabundance of information within its reach, and lead management" to "bury the shareholders in an avalanche of trivial information – a result that is hardly conducive to informed decisionmaking."[146] It also admitted that where the event is contingent or speculative in nature, it is difficult to ascertain whether the reasonable investor would have considered the information significant at the time.[147]

Nevertheless, the Court shunned the idea that materiality was amenable to an easy formula, and in doing so explicitly rejected the standard for materiality created by the Third Circuit, which is similar in many respects to *Fischer II*'s definition of the "serious consideration" rule.[148]   The *Basic* Court explained that under that circuit's law at the time, preliminary merger discussions were per se immaterial "until 'agreement-in-principle' as to the price and structure of the transaction [were] reached."[149]   Consequently,

---

[145] *Id.* at 231 (internal quotation marks omitted).

[146] *Id.* (internal quotation marks omitted).

[147] *Id.* at 232.

[148] *See id.* at 232-33.

[149] *Id.* at 233 (internal quotation marks omitted).

"information concerning any negotiations not yet at the agreement-in-principle stage could be withheld or even misrepresented without a violation of Rule 10b-5."[150]

The Court acknowledged that several reasonable rationales had been offered in support of this test: It answered the concern that an investor not be overwhelmed by excessively detailed and trivial information, assisted in preserving the confidentiality of the discussions, and "provide[d] a usable, bright-line rule for determining when disclosure must be made."[151] Courts adopting the "serious consideration" test have used the same rationales, explaining that it prevents the employer from being burdened "with providing a constant, ever-changing stream of information to inquisitive plan participants";[152] relieves "employers [from] reveal[ing] too soon their internal deliberations to inquiring beneficiaries," which "could seriously impair the achievement of legitimate business goals";[153] and provides a bright-line rule allowing for easier resolution of cases upon summary judgment, unlike the Second Circuit's "fact-specific analysis," which might "result generally in trial litigation."[154]

---

[150] *Id.*

[151] *Id.*

[152] *Hockett v. Sun Co.*, 109 F.3d 1515, 1523 (10th Cir. 1997).

[153] *Id.* (internal quotation marks omitted).

[154] *Martinez v. Schlumberger Ltd.*, 191 F. Supp. 2d 837, 851 (S.D. Tex. 2001).

42

After listing these rationales, however, the *Basic* Court concluded that none of them "purports to explain why drawing the line at agreement-in-principle reflects the significance of the information upon the investor's decision."[155] Taking each rationale in turn, it observed that "[a]rguments based on the premise that some disclosure would be 'premature' in a sense are more properly considered under the rubric of an issuer's duty to disclose," not materiality.[156] Moreover, "[t]he 'secrecy' rationale is simply inapposite to the definition of materiality."[157] It added:

> A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the Securities Acts and Congress's policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality must necessarily be overinclusive or underinclusive.[158]

The Court reasoned that, in contrast to the Third Circuit's test, any determination of materiality requires "delicate assessments of inferences" a reasonable shareholder would draw "from a given set of facts and the significance of those inferences to him."[159] It explained that the Advisory Committee on Corporate

---

[155] *Basic*, 485 U.S. at 234.

[156] *Id.* at 235.

[157] *Id.*

[158] *Id.* at 236.

[159] *Id.* (internal quotation marks omitted).

43

Disclosure "cautioned the SEC against administratively confining materiality to a rigid formula" and added, "[c]ourts would do well to heed this advice."[160]

In conclusion, the Court stated that it could not find any valid justification "for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle ... has not yet been reached."[161]  It also rejected the Sixth Circuit's approach, which provided that when a company denies engaging in merger discussions, information concerning those discussions becomes material by virtue of the statement denying their existence.[162]  It found that this approach failed to recognize that for liability to attach the statements must be misleading "as to a *material* fact.  It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."[163]

In contrast, it endorsed the Second Circuit's approach to materiality, which recognized that it was a fact-based inquiry and depended "upon a balancing of both the indicated probability that

---

[160] *Id.*

[161] *Id.*

[162] *Id.* at 237.

[163] *Id.* at 238.

the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."[164] At its core, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."[165]

*Basic* suggests that we are not to rely on a bright-line test to determine whether a company's alleged misrepresentations are material. We therefore reject the *Fischer II* serious consideration approach to materiality, and adopt a fact-specific approach akin to that promulgated by the Second Circuit in *Ballone* and followed by the Ninth Circuit in *Wayne*. The overarching question in such an analysis is whether there is a substantial likelihood that a reasonable person in the plaintiffs' position would have considered the information an employer-administrator allegedly misrepresented important in making a decision to retire.[166] As the Second Circuit found, this entails consideration of a variety of factors, such "how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes," whether the employee knew or should have been aware of "other information or statements from the company tending to minimize the importance of the misrepresentation," and "the specificity of the

---

[164] *Id.* (internal quotation marks omitted).

[165] *Id.* at 240.

[166] *See ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002).

assurance."[167]

Notwithstanding our rejection of serious consideration as a bright-line rule, we recognize, as did the Third Circuit in *Fischer I*, that the more seriously a plan is being considered, the more likely a representation about the plan is material. Our reservations with the serious consideration test do not lie in its solid underpinnings, which acknowledge the reality that businesses need be allowed some latitude in responding to employee inquiries about future plan changes since at some level the potential for such changes is virtually always being discussed. We hold only that the lack of serious consideration does not equate to a free zone for lying.

**E.**

Taking up the second issue, whether an employer has a fiduciary duty to affirmatively disclose whether it is considering amending its benefit plan, we conclude that no such duty exists. Those circuits which have recognized the existence of such a duty have not presented persuasive reasons, and instead we find that the practicalities of the business world weigh against it. As one commentator has observed, imposing a fiduciary duty to disclose contemplated plan changes is "highly problematic" because, "unless any such duty is strictly limited, the normal decisionmaking

---

[167] *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 125 (2d Cir. 1997).

processes of businesses will be disrupted and their ability to achieve legitimate business goals will be hampered."[168]   For example, a company "that for competitive reasons finds it necessary to reduce its workforce should not be prevented from pursuing a business plan under which an initial early retirement or severance pay plan will be improved if a sufficient number of employees do not elect to retire or terminate employment."[169]   However, if courts were to impose an affirmative duty on employers to disclose such a plan of action, "it would be impossible to implement.   Few employees would elect retirement or terminate employment after being informed that improved benefits would become available if an insufficient number of employees elect to participate."[170]

Similarly, the Second Circuit, in concluding that an employer has no fiduciary duty to voluntarily disclose its consideration of a plan change, has reasoned that

> [u]ntil a plan is adopted, there is no plan, simply the possibility of one.  Insisting on voluntary disclosure during the formulation of a plan and prior to its adoption would ... increase the likelihood of confusion on the part of beneficiaries and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it.  Moreover, any requirement of pre-adoption disclosure could impair the achievement of legitimate business goals....
> Congress's main purpose in imposing a disclosure requirement on ERISA fiduciaries was to ensure that

---

[168] Bintz, *supra* 9, at 997.

[169] *Id.*

[170] *Id.*

47

employees [would have] sufficient information and data to enable them to know whether the plan was financially sound and being administered as intended. Permitting plan fiduciaries to keep secret their pre-adoption deliberations and discussions in no way frustrates this purpose. Rather, such a bright-line rule protects the interests of beneficiaries, who will receive information at the earliest point at which their rights can possibly be affected, as well as the interests of fiduciaries, who will be required to provide information only at the point at which it becomes complete and accurate.[171]

Moreover, this view finds support in the *Variety* Court's characterization of an employer's statements about prospective benefits as an "exercise of discretionary authority." It is also bolstered by the fact that ERISA itself, which includes broad disclosure duties on the part of an employer-administrator, omits mention of any duty on the part of an employer-administrator to disclose that it is considering amending the plan.

Finally, our conclusion squares with the Court's pronouncement that a company does not act in a fiduciary capacity by simply amending a plan.[172] In *Lockheed Corp. v. Spink*, the Court

---

[171] *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278-79 (2d Cir. 1996) (internal quotation marks and citations omitted). Although the *Pocchia* court limited its holding to an employer's duty to disclose its consideration of a plan change in the absence of an employee inquiry, we believe its reasoning is equally applicable to the circumstance in which an employee asks about the status of a company's consideration of a plan change.

[172] *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *see also McCall v. Burlington N./Santa Fe Co.*, 237 F.3d 506, 511 (5th Cir. 2000) (citing *Lockheed* for the proposition that "[a]n employer who adopts, amends, or terminates an employee benefit plan is not acting as a fiduciary").

explained:

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.... [E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.  When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.
> This rule is rooted in the text of ERISA's definition of fiduciary.... [O]nly when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration, does a person become an [ERISA] fiduciary .... [B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review.[173]

However, "[a] court that imposes an affirmative duty to disclose proposed changes on employers must maintain," counter to this precedent, "that the act of amending a benefits plan is a fiduciary function."[174]

We instead take the view that the proper course for an employer to follow is not to affect the employee's decision whether

---

[173] *Spink*, 517 U.S. at 890 (citations and internal quotation marks omitted).

[174] Stover, *supra* note 8, at 731; *see also id.* ("Before a court can impose fiduciary duties on an employer, it must ensure that the employer is acting in a fiduciary capacity.  ERISA's functional definition of 'fiduciary' prevents a court from extending its fiduciary duty to disclose to an employer in the act of amending its benefit plan.  Communicating to an employee about her benefits plan is an act of plan administration; therefore, fiduciary duties attach when an administrator speaks.  Considering whether to amend an employee benefits plan is not an act of plan administration, but an act of plan design.  Because ERISA's functional definition of a fiduciary does not include designing a plan, fiduciary duties do not attach to an employer when it acts in this capacity." (internal citations omitted)).

to retire in any way – not by lying to them to induce them to retire before implementation of an enhanced early retirement program, nor by being forced to tip off the employees to its business strategies to aid them in taking best advantage of the company's future plans.  This middle road will allow the company to make its business decisions without hindrance while prohibiting it from tricking its employees into retirement by making guarantees it knows to be false.

We believe the two views we have promulgated – that an employer has no affirmative duty to disclose the status of its internal deliberations on future plan changes even if it is seriously considering such changes, but if it chooses in its discretion to speak it must do so truthfully – coalesce to form a scheme that accomplishes Congress's dual purposes in enacting ERISA of protecting employees' rights to their benefits and encouraging employers to create benefit plans.  As one commentator has explained:

> [A] limited duty can reasonably be imposed on fiduciaries to refrain from making, either in response to participant inquiries or at fiduciaries' own initiative, material misrepresentations .... Under such a standard, a fiduciary would not be prohibited from declining to comment on the prospect of future changes, or from making generalized statements to the effect that the plan sponsor always retains the right to amend a plan.  [In this way,] businesses will not be unduly discouraged from adopting or amending early retirement, severance or other types of plans, and participants' interests can be adequately protected from material misrepresentations that are intended to induce conduct that is contrary to

50

their interests.[175]

## III.

The district court, not having the benefit of our guidance on this issue, applied *Fischer II*'s formulation of the serious consideration test. It determined that the summary judgment evidence, even when viewed in a light most favorable to the plaintiffs, revealed that executives at Schlumberger did not seriously consider the new plan at the time personnel representatives informed the plaintiffs that they had not heard of a new plan or that no new plan was in the works. On this basis the district court granted summary judgment in favor of Schlumberger as to plaintiffs' allegations that Schlumberger breached its duty to affirmatively disclose the changes and its duty not to misrepresent the possibility of future changes.

In contrast to the district court's analysis, our approach requires that we divide the plaintiffs' allegations into two parts. First, the plaintiffs allege that Schlumberger violated its duty to disclose to the plaintiffs that it was considering an early retirement offering. Because we find that no such duty exists, we conclude that summary judgment was appropriate as to these allegations.

The plaintiffs also contend that Schlumberger affirmatively misrepresented that no new plan would be forthcoming, or that it

---

[175] Bintz, *supra* note 9, at 998.

51

did not know that a plan was being formulated when in fact it was. According to plaintiff Martinez's deposition testimony, sometime prior to the week of his retirement Martinez visited the human resources office at Schlumberger and inquired "about the possibility of there being a [new voluntary early retirement] package." The personnel employee replied that "he hadn't heard of anything coming down." Similarly, plaintiff Ditta testified that in April or May 1998, he asked his boss about the possibility of such a package, and his boss stated that he had not heard of anything, but Ditta should ask personnel. Soon after, at a company party, Ditta asked his section head if he had "heard of any retirement package being offered." The section head replied that "he hadn't heard, let's go talk to" a representative from personnel. The personnel employee also stated that "he had not heard anything at this time," and added that "Schlumberger was doing too good right now and they would not be offering any packages because they'd lose too many good people." In May or June Ditta went to personnel and asked another employee about whether "she heard any kind of rumor of a package being offered," and she replied that "[s]he had not heard of anything." Along the same lines, more than a month before Plaintiff Kirksey retired, he inquired of the personnel office, "You are not giving out a package once I leave, are you?" and was told, "No, I ain't heard anything about a package."

We conclude that no genuine issue of material fact exists as

52

to whether these statements were material or misleading. In simplest terms, the plaintiffs asked if Schlumberger planned to roll out an enhanced benefits plan in the near future, and were told that such a decision had not been made. Such statements could not have been material nor misleading until Schlumberger had actually decided to implement such a plan.

Nor are we troubled by the statement to Ditta that "Schlumberger was doing too good right now and they would not be offering any packages because they'd lose too many good people." Although false statements, including statements about future plan changes such as those found in *Ballone*, may constitute material misrepresentations even if no plan change is being seriously considered at the time,[176] we are satisfied that any reasonable listener would understand the statement to Ditta to have been no more than the unsupported speculation of a fellow employee.

For these reasons, we AFFIRM the judgment of the district court. Schlumberger had no affirmative duty to communicate the status of its internal deliberations regarding a possible plan change, and in responding to the plaintiff's inquiries it did not materially misrepresent the possibility of a change.

---

[176] In this regard, we note with approval the Ninth Circuit's statement in *Wayne* that "[a] person actively misinforms by saying that something is true when it is not true," and also "by saying that something is true when the person does not know whether it is true or not." *Wayne v. Pac. Bell*, 238 F.3d 1048, 1055 (9th Cir. 2001).