**Gilbert J. LIBRIZZI, Plaintiff–Appellant,**

v.

**The CHILDREN'S MEMORIAL MEDICAL CENTER, et al., Defendants–Appellees.**

No. 97–1934.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1997.

Decided Jan. 26, 1998.

Rehearing Denied March 6, 1998.

Mary Cannon Veed (argued), Jessica Tovrov, Peterson & Ross, Chicago, IL, for Plaintiff–Appellant.

Mark A. Casciari (argued), James D. Jorgensen, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

After Gilbert Librizzi, vice president for facilities design and construction of the Children's Hospital Medical Center in Chicago, suffered a stroke, he elected early retirement at age 59 under his employer's pension benefit plan. Within a year he concluded that this had been a mistake—that he would be better off with disability benefits until 65 and a full pension thereafter. He asked the Medical Center to make this adjustment, but it refused, for elections under the plan are conclusive in light of the relation between age and risk of mortality. For example, the regular retirement benefit is higher (per month) than the early retirement benefit not only because contributions through age 65 pro-

duce a higher principal sum that can be annuitized over a shorter period (persons who start receiving benefits at 65 expect to live fewer months than those who start at 59) but also because some employees die before age 65 and therefore do not receive any pension. Allowing an employee to take early retirement and switch to regular retirement if he lives until 65 would wreak havoc with the actuarial assumptions on which pension plans are based. The Medical Center did grant Librizzi's belated request for disability benefits, which he received until he reached 65. Librizzi concedes that he is not entitled to regular retirement benefits under the terms of the pension plan. Nonetheless he filed this suit under ERISA, see 29 U.S.C. § 1132(a)(3), demanding damages equal to the present value of the difference between early retirement benefits and regular retirement benefits for months following his 65th birthday.

His principal contention is that the employer failed to give accurate advice about his eligibility for disability benefits, leading him to make a poor choice among options open at the time. Librizzi contends that in July 1990 he asked Anne Haule, the vice president for human relations, about using disability leave, and that she replied: "I don't think you qualify, but I will check into it and I will get back to you." She never did, Librizzi says. He asked her because at the end of June 1989 he had changed from full-time to part-time duty and wondered whether a part-time employee qualified for disability benefits. It was an odd question for Librizzi to ask, because before switching to part-time employment he learned that he did qualify; in May 1989 Haule sent him a memorandum stating that when working reduced hours he would be eligible for disability coverage "on the same basis as he is now". Librizzi then moved to a 30–hour workweek. He also received a summary plan description that did not say or imply that part-time employees lose disability benefits. But by the time he raised the question with Haule again, both may have forgotten the research and memo of a year earlier—and Librizzi did not reread the documents in his own files. (It was the rediscovery of Haule's memo in October 1991 that led Librizzi to request both immediate

disability benefits and a restoration of the full pension at age 65.) Incorrect advice violates the employer's fiduciary duty under § 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), Librizzi submits.

We shall assume not only that Librizzi received poor advice but also that this is actionable under ERISA, although neither is clear. *Varity Corp. v. Howe,* ––– U.S. –––, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), on which Librizzi relies, involved intentional deceit—efforts to swindle employees into surrendering their retirement benefits. Uninformed but well-meaning advice poses a different problem. The employer denies misleading Librizzi at all, and the fact that he had Haule's memorandum containing accurate information makes it questionable to treat inconsistent oral statements (or delay in responding to oral inquiries) as statutory violations. No firm can ensure that all off-the-cuff statements are accurate descriptions of pension and welfare plans; complex plans are hard to explain in a few words, and the risk of error is correspondingly high. That is why ERISA requires accurate *written* summary plan descriptions (which Librizzi had). Moreover, it is difficult to determine after the fact whether bad advice was given: the participant may misremember or misrepresent what was said, while the employer's agents are likely to forget what they said to a particular participant on a particular occasion. Revealing the truth in writing usually precludes a claim based on a supposed oral error. See, e.g., *Central States Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256 (7th Cir.1994) (oral understandings and practices may not be used to vary pension promises); *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1215 (7th Cir.1997) (an oral statement contradicted by written documents cannot be fraud in contract law); *Carr v. CIGNA Securities, Inc.,* 95 F.3d 544 (7th Cir.1996) (same principle in securities law). Little wonder, then, that *Schmidt v. Sheet Metal Workers' Nat. Pension Fund,* 128 F.3d 541 (7th Cir.1997), rejects a claim that bad advice delivered verbally violated the plan administrator's fiduciary duty, when written documents provided accurate information. Haule sent Librizzi an accurate memoran-

dum in 1989. The summary plan description told participants how to apply for disability benefits; conversation with a vice president is not an approved method (and Librizzi did not submit a formal application). But it is unnecessary to pursue this subject, for even the assumption that oral misstatements were made, and are actionable, does not help a participant who waits more than three years to file suit.

Haule made her statement in July 1990; Librizzi elected early retirement early in 1991 and started receiving benefits on February 1, 1991; he asked the Medical Center in October 1991 to change his retirement package, so he must have learned by then that Haule's oral response had been incorrect; but he did not file suit until April 1996, about 4½ years later. Here is the governing statute of limitations:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constitutes a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. See *Rush v. Martin Petersen Co.,* 83 F.3d 894 (7th Cir.1996); *Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078 (7th Cir.1992). The district court concluded that Librizzi had "actual knowledge" in October 1991 and dismissed the suit as untimely.

The Medical Center asks us to dismiss the appeal, or at least to hold that Librizzi is confined to the arguments he made to the district court when seeking reconsideration of the order dismissing the suit. The reason: Librizzi's notice of appeal

identifies the judgment of January 1997, rather than the order of March 1997 denying reconsideration, as the order under review. But this is entirely proper. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Chaka v. Lane*, 894 F.2d 923 (7th Cir.1990). It is never necessary—and may be hazardous—to specify in the notice of appeal the date of an order denying a motion under Fed.R.Civ.P. 50 or 59. Identifying the final decision entered under Rule 58 as "the judgment, order, or part thereof appealed from" (Fed. R.App. P. 3(c)) brings up all of the issues in the case. Pointing to either an interlocutory order or a post-judgment decision such as an order denying a motion to alter or amend the judgment is never necessary, unless the appellant wants to confine the appellate issues to those covered in the specific order. An appeal from the Rule 58 final judgment always covers the waterfront. The whole case is properly before us for decision.

■■ There's just no avoiding the fact that 4½ years is longer than 3, the statutory maximum for a fiduciary-duty claim once the participant acquires "actual knowledge of the breach or violation." ("[F]raud or concealment" is not alleged.) Librizzi seeks to sidestep this in several ways. One is to contend that he is seeking "unpaid benefits" and the longer statute of limitations that accompanies such claims. But he concedes that he is not entitled to any additional benefits *from the pension plan.* The plan gave him exactly what he asked for (early retirement benefits); he is not entitled to regular retirement benefits after having received early-retirement benefits; thus his current claim is for damages from the employer in its role as the plan's administrator (and thus as his fiduciary) in lieu of benefits from the pension trust. An employer cannot be compelled to pay any particular amount of retirement benefits; an employer does not pay *any* benefits and is distinct from the pension trust, which had nothing to do with the circumstances of which Librizzi complains. Oral statements cannot modify a pension plan under ERISA, *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989) (en banc); *Joe McClelland, Inc.*, 23 F.3d at 1257–58, especially not when the person making the statement lacks authority to speak for or alter the plan. Whether estoppel has any role to play if the plan itself makes an error is not something we need consider today. Cf. *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 759 (7th Cir.1994).

■■ A second line of argument is that the breach of fiduciary duty did not really occur until the employer failed to correct its error. That did not happen before March 1996, when the Medical Center broke off negotiations, Librizzi submits; until then the employer could have ensured that he received unreduced pension benefits from the first day of eligibility. Indeed, Librizzi verges on the argument that, because the Medical Center still can top up his benefits, the time has not yet begun to run. Yet if Librizzi made a request for a pension that the plan had turned down, the denial would have been actionable immediately even if the payments would not have started immediately. An adverse decision whose effect is deferred gives rise to a claim when the decision is made, not when the effect is felt. This is a commonplace in the law of employment discrimination.

Suppose the employer says: "Your job ends 12 months from today; start looking for work." Does the statute of limitations begin to run immediately, or does the claim accrue only when the paychecks stop? Under *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), it begins on the date the employee learns about the adverse decision—when the federal law was (or was not) violated—rather than when the financial consequences of the decision are felt. If the employer allows an appeal of the decision, as many do (arbitration under collective bargaining agreements, or appeals by faculty to college presidents), the time to sue is unaffected—for failure to correct a violation of federal law is not itself a violation of that law. *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir.1992). Cf. *Moskowitz v. Purdue University*, 5 F.3d 279 (7th Cir.1993).

Well, that's the position Librizzi was in. He received bad advice in July 1990, which may have led to a bad decision in January 1991; he learned no later than October 1991 that he could have done better financially, but the employer refused to make amends. The "breach or violation" for purposes of § 1113(2) was the bad advice in July 1990, or (most favorably to Librizzi) the failure to provide accurate information in time to affect the irrevocable election made in January 1991. Actual knowledge in October 1991 started the three-year period of § 1113(2).

Librizzi observes that under § 1113(1)(B) in omissions cases a six-year period begins on "the latest date on which the fiduciary could have cured the breach or violation" and submits that failure to cure should be equally important under § 1113(2) because only then does the participant know the financial outcome. But that would destroy the structure of the statute, which gives participants the shorter of two periods, one measured from the violation and the other from knowledge. Librizzi is really asking for the *longer* of the periods. We doubt that this is an "omission" case to begin with, or that the date of "cure" would extend beyond January 1991—for "cure" in the sense of "fix" must be distinguished from "provide a remedy" in the sense of "damages for what can no longer be fixed", lest § 1113(1)(B) mean that the time never runs out—but none of these issues matters, given § 1113(2).

To say that the clock measuring a period of limitations has been set in motion is not necessarily to say that it has been running continuously. Time may be tolled, or the adverse party may be estopped to rely on the period of limitations. See generally *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir.1990). But Librizzi does not argue that the employer concealed the violation (hardly possible, given that "actual knowledge" is the triggering event under §·1113(2)), promised not to plead the statute of limitations, or otherwise laid the foundation for a claim of equitable estoppel. He does observe that there have been sporadic negotiations concerning what, if anything, the Medical Center would do to set things right. At oral argument Librizzi's lawyer suggested

that these negotiations might support a claim of tolling. For two reasons this won't work. The first is that Librizzi did not assert tolling in the district court or his appellate briefs (a heading in Librizzi's reply brief reads: "Plaintiff Has No Need Of A Tolling Argument, And Did Not Make One"); oral argument is too late. The second is that neither denials of liability nor negotiations toll the period of limitations. See *Singletary v. Continental Illinois National Bank*, 9 F.3d 1236, 1241 (7th Cir.1993). One common subject of pre-litigation negotiation is the statute of limitations; a potential defendant often will agree not to assert this defense, the better to continue the negotiations and resolve the dispute out of court. Formal waivers would hardly be necessary if the very fact of ongoing negotiations tolled the statute of limitations. Sometimes the terms of a waiver or suspension agreement may imply some additional tolling, as in *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 875–77 (7th Cir.1997), but Librizzi does not contend that he reached a partial agreement with the Medical Center that led him to defer litigation. He has been an unsuccessful supplicant throughout, and multiple unrequited demands do not provide additional time to start a suit.

AFFIRMED.