In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-3175

UNITED STATES OF AMERICA
BY AND THROUGH JOSEPH E. GARST,

*Plaintiff-Appellant*,

*v.*

LOCKHEED-MARTIN CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 C 5072—**John F. Grady**, *Judge*.

ARGUED APRIL 14, 2003—DECIDED MAY 8, 2003

Before CUDAHY, POSNER, and EASTERBROOK, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*.  In 1990 the Department of Veterans Affairs chose Lockheed-Martin as the supplier of a new office automation system that was supposed to provide software, hardware, and services for database management and other services across a secure nation-wide network. Lockheed performed under this contract between 1991 and 1997. Shortly after the VA replaced Lockheed with a different vendor, Joseph Garst, who used to work at the VA, filed this *qui tam* action on behalf of

the United States. Garst alleged that Lockheed had violated the False Claims Act, 31 U.S.C. §§ 3729-33, by over-promising and under-performing, submitting fraudulent claims in the process. After reviewing Garst's allegations, the Department of Justice declined to take over the suit, leaving it in private hands.

Garst's complaint did not allege any specific fraud, leading Lockheed to move for its dismissal. (We use "Lockheed" as a collective description for all defendants, which include multiple corporate subsidiaries. Lockheed Martin Integrated Solutions Co., which performed the services under the contract, has been sold since 1997 to ACS State and Local Solutions, Inc., a subsidiary of Affiliated Computer Services, Inc., but Lockheed apparently retains all potential liability in this case.) Before the district court could act on Lockheed's motion, Garst filed an amended complaint. At 16 pages and 71 paragraphs, it was 50% longer than the initial complaint—but, the district judge concluded, no better. The court dismissed it for failure to plead fraud with particularity, 158 F. Supp. 2d 816 (N.D. Ill. 2001), a requirement that applies because the False Claims Act condemns fraud but not negligent errors or omissions. The district court observed that Garst had not given any specific example of a fraudulent claim. The judge permitted Garst to try again but reminded him of the need to allege "the who, what, when, where, and how: the first paragraph of any newspaper story." See *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The judge instructed Garst to file an organized and concise document.

Garst's second amended complaint ballooned to 74 double-spaced pages with 198 paragraphs. Concise it was not. Before Lockheed could respond, Garst filed a third amended complaint, which broke the scale at 109 pages containing 345 numbered paragraphs; this document had 74 attachments, many of them lengthy. Lockheed asked the dis-

trict judge to dismiss this complaint for failure to plead fraud with particularity, as Fed. R. Civ. P. 9(b) requires, and for the omission of any "short and plain statement of the claim", as Fed. R. Civ. P. 8(a)(2) contemplates. These rules are not in conflict: it is possible to write a short statement narrating the *claim*—which is to say, the basic grievance—even if Rule 9(b) requires supplemental particulars. But the district judge concluded that this complaint is so sprawling as to be essentially incomprehensible (a Rule 8 problem) and that despite the bloat it lacks details outlining fraud (a Rule 9 shortcoming). Instead of dismissing this complaint, the judge directed Garst to file a more definite statement. To make sure that Garst knew exactly what was needed, the judge explained that the statement "should be brief and should as to each count: (1) identify <u>specific</u> false claims for payment or <u>specific</u> false statements made in order to obtain payment; (2) if a false statement is alleged, connect that statement to a specific claim for payment and state who made the statement to whom and when; and (3) briefly state why those claims or statements were false" (underlining in original). Garst responded with 23 single-spaced pages plus 25 new attachments. The statement is loaded with so many acronyms and cross-references to the third amended complaint (plus its attachments) that no one could understand it without juggling multiple documents. Concluding that matters had taken a turn for the worse, the district judge threw up his hands and dismissed the complaint, with prejudice, for Garst's inability or unwillingness to conform his pleadings to Rules 8 and 9. 2002 U.S. Dist. LEXIS 14307 (N.D. Ill. July 31, 2002).

The third amended complaint and statement together equate to 155 double-spaced pages and more than 400 numbered paragraphs, plus 99 attachments. You'd think that all this paper and ink would be enough to narrate at least one false claim. Yet Garst's appellate brief does

not extract from the pleadings a single instance of a false statement made to obtain payment. A few selections from the "more definite statement" show why, after four years of overseeing Garst's efforts to plead a claim, the district judge's patience ran out. Here is the first paragraph of the "more definite statement," right under the caption "SPECIFIC FALSE OR FRAUDULENT CLAIMS FOR PAYMENT (SFCFP)" (a caption that shows Garst's love of inscrutable acronyms):

> Claim for $2,584,926.04, MDS Ex. 1, TAC Ex. 47, submitted on August 9, 1993 and related payments by T.A. Sieverson, Vice-President of Lockheed Integrated Solutions Company, Lockheed Corporation to VA Contracting Officer Steve Stapleton for equipment and service provided during Phase I and Phase II of the OA&MM/ISMS LAN/WAN PROJECT. See TAC ¶¶ 141-181, 217-243, 252, 280-282, 291-295.

The acronyms alone force readers to look elsewhere. MDS means "More Definite Statement" and "TAC" means "Third Amended Complaint." LAN is local area network, WAN is wide-area network, and PROJECT appears to be the word "project" masquerading as an acronym. What "OA&MM/ISMS" might mean, we have not endeavored to discover. It is not defined anywhere in the more definite statement. To understand the paragraph one would have to read two exhibits and *seventy-seven* paragraphs scattered throughout the third amended complaint! This is simplification? Yet still one would not learn (a) what Sieverson said, (b) why it is false, and (c) what OA&MM/ISMS stands for. Paragraph 21 of the "specific false claims" reads: "All Lockheed invoices and payments within the statute of limitations following Lockheed purchasing tickets in excess of one thousand dollars for VA presidential appointees and senior executives, as detailed in TAC ¶55-Ex 5 and 6." This is specific? How does "[a]ll

Lockheed invoices and payments within the statute of limitations" zero in on the fraud? And, once again, what were the statements and why were they false? Garst reveals in his appellate brief that, in his view, any claim for payment implies that the vendor has not violated any ethical rules and that by lobbying the VA's top officials Lockheed committed such violations. Why ethical problems (if any) equate to fraudulent claims is hard to see; at all events, the pleading defect is that Garst has made it so hard to grasp his point.

The second section of the "more definite statement" begins with the caption "SPECIFIC FALSE STATEMENTS OR RECORDS MADE IN ORDER TO OBTAIN PAYMENT". The first paragraph in this section reads:

> The total claims for the OA&MM LAN/WAN are fraudulent or false because Lockheed's cost estimate given to the VA's Stapleton was false because, to obtain the project task order, Lockheed told the VA that it could accomplish the OA&MM LAN/WAN statement of work for $1.2 million, a savings of $700,000 over the previously selected Banyan VINES configuration. Lockheed billed the VA for at least $2.6 million and never delivered a working LAN/WAN that met the contract requirements. Lockheed submitted the false cost statement to the NOAVA Contracting Officer (Stapleton). TAC ¶ 141, Ex. 41.

"NOAVA" stands for "National Office Automation for Veterans Affairs." VINES expands to "Virtual Integrated Network Services" but used in this paragraph is the name of a competitor's product rather than an acronym for a family of network protocols. What "the OA&MM LAN/WAN statement of work" might be is a mystery; perhaps Garst meant to say "segment of work." A contention that the "total claims" are false again fails the requirement of

specificity. What did Lockheed say? This time Garst at least hints at a falsehood: Lockheed promised to do a task for $1.2 million and eventually billed $2.6 million without meeting contract requirements. (Other parts of the complaint and statement suggest that the shortcoming that most concerns Garst is Lockheed's inability to make the network secure enough for the transmission of military secrets, though an outsider might suppose that a database of pensions and health benefits does not require quite that degree of sophisticated encryption.) Yet failing to keep one's promise is just breach of contract, and cost overruns in government procurement projects may occur without fraud. To satisfy Rule 9(b), Garst had to allege that Lockheed said something knowing at the time that the representation was false (or not intending to perform); failures to satisfy the customer *ex post* are not fraud, for as Judge Friendly remarked there is no "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). See also *Murray v. Abt Associates Inc.*, 18 F.3d 1376 (7th Cir. 1994). The VA hired Lockheed to solve problems. That Lockheed knew in advance that there *were* problems (the most charitable description of Garst's allegations), some of which turned out to be insuperable (by Lockheed's staff, at least), does not come close to alleging fraud with particularity.

We could go on with other paragraphs of the complaint and statement, but there would be little point to the exercise. Some come closer to specific allegations of deceit but fail to link them to any claim for payment. (Lockheed says that it swallowed some of the costs, and did not submit bills, when it realized that certain objectives could not be achieved.) But even if it were possible to navigate through these papers to a few specific instances of fraud, why should the court be obliged to try? Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin

from a bucket of mud. Federal judges have better things to do, and the substantial subsidy of litigation (court costs do not begin to cover the expense of the judiciary) should be targeted on those litigants who take the preliminary steps to assemble a comprehensible claim. Garst's lawyer filed documents so long, so disorganized, so laden with cross-references and baffling acronyms, that they could not alert either the district judge or the defendants to the principal contested matters.

Some complaints are windy but understandable. Surplusage can and should be ignored. Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case. A district court is not "authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter, a disposable husk around a core of proper pleading." *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820 (7th Cir. 2001). But although "[f]at in a complaint can be ignored", *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998), "dismissal of a complaint on the ground that it is unintelligible is unexceptionable." *Davis*, 269 F.3d at 820. Length may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter. Three other circuits have held that length and complexity may doom a complaint by obfuscating the claim's essence. See *In re Westinghouse Securities Litigation*, 90 F.3d 696, 702-03 (3d Cir. 1996) (600 paragraphs spanning 240 pages); *Kuehl v. FDIC*, 8 F.3d 905, 908-09 (1st Cir. 1993) (358 paragraphs in "only" 43 pages); *Michaelis v. Nebraska State Bar Association*, 717 F.2d 437, 439 (8th Cir. 1983) (144 para-graphs in 98 pages). At 400 paragraphs covering 155 pages, and followed by 99 attachments, Garst's distended plead-ings join that unsavory company. A concise statement of the claim illustrated by 400 concrete examples of fraud would be one thing, but 400 variations on the kind of paragraph we have quoted are quite another. Complaints

like this are pestilential, and the district court showed great restraint in wading through four iterations plus one "more definite statement" before giving up. Garst received more judicial attention than his pleadings deserved.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*