# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3907

RANDALL A. BEACH,

*Plaintiff-Appellee,*

v.

COMMONWEALTH EDISON COMPANY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 3357—**Joan Humphrey Lefkow**, *Judge.*

_____

ARGUED APRIL 16, 2004—DECIDED AUGUST 24, 2004

_____

Before EASTERBROOK, RIPPLE, and DIANE P. WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* After 31 years on the job, Randall Beach retired from Commonwealth Edison in June 1997 and moved to Idaho. He was 52 at the time. By leaving before age 55, Beach gave up entitlement to future health benefits, though he retained his vested pension. Before taking this extra-early retirement, Beach asked his supervisor, plus ComEd's human resources staff, whether there was any immediate prospect that the firm would offer a voluntary separation package in his department, the Transmission

and Distribution Organization. Beach knew that ComEd was reorganizing department by department and that it sometimes offered sweeteners, such as severance pay and health benefits, to those who agreed to depart. As Beach remembers these conversations, "everybody said absolutely it's not going to happen. You're not going to get the package. The company is not going to offer your department a package. It just will not happen. That was the essence of everything I got." Six weeks after Beach's retirement, however, ComEd did offer a separation package to 240 of the 4,700 employees in his department. Had he been employed on August 7, 1997, Beach would have been eligible for these benefits. When ComEd declined to treat him as if he had departed in August or September rather than May (when he gave notice and stopped working) or June (when he left the payroll), Beach filed this suit under the Employee Retirement Income Security Act. After a bench trial on stipulated facts, the district judge concluded that ComEd had violated its fiduciary duty to a participant in an ERISA plan by giving incorrect advice. Even though no one had intended to deceive Beach—ComEd's senior managers did not begin to consider separation benefits for the Transmission and Distribution Organization until after Beach's retirement, and no one in the human resources staff knew what was coming—the district judge held that ComEd must treat Beach as if he had stayed through August and qualified for all benefits then on offer. 2003 U.S. Dist. LEXIS 17675 (N.D. Ill. Oct. 2, 2003); see also 2002 U.S. Dist. LEXIS 14663 (N.D. Ill. Aug. 6, 2002).

The district court's major premise is that ComEd owed Beach a fiduciary duty with respect to future fringe-benefit plans, because he was a participant in the firm's pension plan. The court's minor premise is that any material inaccuracy, even an unintentional error, violates that fiduciary duty. The minor premise is problematic given this court's decisions in *Vallone v. CNA Financial Corp.*, No. 03-2090 (7th Cir. July 15, 2004), slip op. 29-33; *Frahm v. Equitable*

*Life Assurance Society*, 137 F.3d 955 (7th Cir. 1998); and *Librizzi v. Children's Memorial Medical Center*, 134 F.3d 1302 (7th Cir. 1998), though it has some support elsewhere. See *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407 (5th Cir. 2003); *Bins v. Exxon Co.*, 220 F.3d 1042 (9th Cir. 2000) (en banc). We need not consider the minor premise, however, because the district court's major premise is mistaken.

Duties under ERISA are plan-specific. See *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 811 (7th Cir. 1994); *James v. National Business Systems, Inc.*, 924 F.2d 718, 720 (7th Cir. 1991). The statute defines a "fiduciary" as a person who exercises authority or discretion over the administration of a plan, but only when performing those functions. 29 U.S.C. §1002(21)(A). Thus an employer is not a fiduciary when considering whether to establish a plan in the first place, or what specific benefits to offer when creating or amending a plan. See *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999); *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184 (7th Cir. 1994). Otherwise by adopting a pension plan an employer would become its employees' fiduciary for all purposes and would be obliged, for example, to maximize its workers' salaries or to design plans that maximize fringe benefits. As *Hughes Aircraft* and similar decisions show, that is not ERISA's command. Beach was (and is) a participant in ComEd's pension plan but does not contend that he has received less than his due under it. He also was a participant in some welfare-benefit plans, such as ComEd's healthcare plan; once again, however, he does not complain that ComEd wrongfully denied him any of those benefits or misled him in any way about them. He knew that if he left before age 55 those benefits would end; that decision was made with eyes open. What he wants—and what the district court gave him—is benefits under a separate plan that was not established until after he quit.

Throughout his briefs, Beach proceeds as if the separation

incentives were created by amendment of a plan in which he was already a participant. That enables him to invoke *Varity Corp. v. Howe*, 516 U.S. 489 (1996), which held that ERISA prohibits a plan fiduciary from deceiving participants in an existing pension plan about the value of its benefits compared with those under a successor or substitute plan. Yet the plan under which Beach wants (and was awarded) benefits does not amend or modify any of ComEd's other plans—nor did Beach have to choose between its benefits and those of the plans in which he was a participant. The "Voluntary Separation Plan for Designated Transmission and Distribution Management Employees of Commonwealth Edison Company" dated August 7, 1997, is in the record: it is a stand-alone welfare-benefit plan that does not amend, supplement, or replace any other plan. As it did not come into existence until after Beach's retirement, ComEd did not owe him any fiduciary duty concerning its benefits.

Doubtless federal common law prohibits fraud with respect to pension and welfare benefits, apart from any need to invoke ERISA's fiduciary duty. ERISA preempts state law relating to pension plans, and federal courts regularly create federal common law (based on contract and trust law, see *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)) to fill the gap. As we have emphasized, however, Beach does not contend that anyone defrauded him. Fraud requires knowledge of the truth and an intent to conceal or mislead. See, e.g., *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). The people Beach consulted failed to foresee events, which is understandable because no plan had been proposed, let alone adopted, at the time. The district judge did not find the advice to have been either malicious or reckless. Even in retrospect it does not look wildly inaccurate. Beach worked in a division with 4,700 employees, only 240 of whom received an offer of special voluntary-separation benefits. By and large, employees in that division would

have done well to make plans on the assumption that the pension and welfare systems already in place were the only ones they need consider. It turns out that Beach would have been among the fortunate 5% in his division, but just as there can be no fraud by hindsight (see *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.)) so a prediction that pans out for 95% of the concerned employees is hard to condemn just because it misses the mark for the rest. See *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003); *Murray v. Abt Associates Inc.*, 18 F.3d 1376, 1379 (7th Cir. 1994); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627-28 (7th Cir. 1990). The staff should have let Beach know the limits of their information. (Perhaps they did so; it is hard to reconstruct oral advice after the fact, especially when one side does not remember anything. Only Beach recollects the conversations, and he got only the gist; he does not remember the precise words anyone used.) Negligent failure to add disclaimers and cautions is some distance from fraud, however.

A number of decisions address the question whether ERISA requires plan sponsors to give accurate information about potential amendments to existing plans. *Varity* shows that candid and complete information is required if two plans are in existence, and the sponsor tries to persuade employees to give up benefits under one in exchange for benefits under the other. These follow-on decisions conclude that a similar approach governs when a single plan is in the process of amendment. The majority view is that a duty of accurate disclosure begins "when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Fischer v. Philadelphia Electric Co.*, 96 F.3d 1533, 1539 (3d Cir. 1996). At that point details of the amendment become material; until then there is only speculation. Accord, *Vartanian v. Monsanto Co.*, 131 F.3d 264, 272 (1st Cir. 1997); *McAuley v. IBM Corp.*, 165 F.3d 1038, 1043 (6th Cir.

1999); *Wilson v. Southwestern Bell Telephone Co.*, 55 F.3d 399, 405 (8th Cir. 1995); *Bins, supra*, 220 F.3d at 1048; *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180-82 (9th Cir. 2004); *Hockett v. Sun Co.*, 109 F.3d 1515, 1522-23 (10th Cir. 1997); *Barnes v. Lacey*, 927 F.2d 539, 544 (11th Cir. 1991). Two circuits conclude that the duty of disclosure arises sometime before the change is under "serious consideration"—though just what must be disclosed, and when, these circuits have struggled to pin down. See *Ballone v. Eastman Kodak Co.*, 109 F.3d 117 (2d Cir. 1997); *Martinez, supra*.

This debate mirrors (though the decisions do not acknowledge) a controversy in corporate and securities law. How soon must issuers of securities tell investors, or their employees, that merger discussions or other potentially substantial corporate transactions are afoot? We know from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), that firms cannot commit fraud about such transactions at any stage, but the time at which the information becomes so important that it must be disclosed accurately (if the issuer says anything), even if there is no intent to deceive, has been hard to determine. We have taken the view that accurate disclosure is not required until the price and structure of the deal have been resolved, see *Flamm v. Eberstadt*, 814 F.2d 1169 (7th Cir. 1987), though earlier disclosure may be required in closely held corporations, see *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir. 1987). No court has held, however, that there is a duty in corporate or securities laws to predict accurately events that lie ahead. There is no reason why ERISA should require more.

The majority rule, reflected in *Fischer*, has the better of this debate. Giving firms a duty to forecast accurately, if the benefits staff says anything at all, could not help plan participants. It would just induce employers to tell the human resources staff to say nothing at all—to make no predictions and to refer employees to the printed plan de-

scriptions. Yet chancy predictions may be better than silence; think of the 95% of the employees in ComEd's Transmission and Distribution Organization who would have received exactly the right advice, which could have facilitated their retirement planning. The alternative to enforced silence would be a declaration in the employee handbook that no one should rely on any oral information about the plans. That might or might not curtail legal risks—some workers would be bound to ask why the firm even had a benefits advisory staff, if it was insisting that everything the staff said was worthless—but again would do little to help people in Beach's position. It does not take familiarity with Bayes's Theorem to see that even potentially fallacious news may be better than no news. If the benefits staff must clam up, then rumor and office scuttlebutt come to the fore, and it is likely to be less accurate than the staff's educated guesses. So we are not persuaded by *Ballone* or *Martinez*.

ComEd did not amend any of its plans. We need not decide whether *Fischer*'s approach would apply to the establishment of a new plan, because none was under consideration when Beach resigned. There was no proposal at all, let alone a specific proposal under review by senior managers. It is undisputed that ComEd did not begin internal discussion of the details about the Transmission and Distribution Organization's reorganization until mid-June 1997, a month after Beach had given notice (and about the same time as his last day on the payroll). ComEd concluded that a small net reduction in staff would be required—about 30 of the 4,700 positions were to be eliminated. At a meeting on July 22 or 23, 1997, managers began to discuss whether it would make sense to use separation incentives, as opposed to other means, to achieve this reduction. Sometime late in July or early in August, Howard Nelson, ComEd's "Strategic Staffing Director," drafted a separation-incentives plan covering only 5% of the division's staff (240 employees, in

the hope that 30 would take the bait). This plan was approved by Paul McCoy, Vice President for the Transmission and Distribution Organization, on August 6, and was announced to employees the next day. None of the circuits following the *Fischer* approach would conclude that this plan was under "serious consideration" before Beach retired. So even if we were to apply this approach to new plans—a question that we do not resolve today—Beach could not benefit.

Beach was not the victim of fraud, and ComEd did not have a duty of accurate disclosure in the period preceding the plan's adoption. The human relations staff might have been careless, but it did not violate any duty of loyalty owed to Beach. Accordingly, the judgment of the district court is reversed.

RIPPLE, *Circuit Judge*, dissenting. A single principle controls this case. "[A] fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1104 are owed." *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988). Mr. Beach was a participant in ComEd's retirement pension plan and its health-care plan; ComEd and Mr. Beach were in a fiduciary relationship with respect to these plans. *See supra* at 3. The Voluntary Severance Plan ("VSP"), in essence, supplemented the retirement pension plan and the health-care plan. Therefore, when ComEd misrepresented the status of the VSP and its future plan-related benefits, it was "administer[ing]" these plans under the rationale of *Varity Corporation v. Howe*, 516 U.S. 489 (1996). Because, in its administration, ComEd made material misrepresentations in

violation of its fiduciary duties, I would affirm the judgment of the district court.

## 1.

My colleagues hold that ComEd's misrepresentations were not made in a fiduciary capacity and thus are not actionable. Their view rests on the conclusion that ERISA's fiduciary duties are plan-specific. That proposition is unassailable, as far as it goes. ERISA requires plan "fiduciar[ies]" to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Section 1002(21)(A) of the same title states that "a person is a fiduciary with respect to a plan to the extent" he is involved in "management" or "administration" of "such plan." Sections 1002(1) and 1002(2)(A) define an applicable "plan" as one that is "established or maintained." Therefore, ERISA's fiduciary duties attach to an employer such as ComEd when it is a "fiduciary" with respect to an "established" plan and "manage[s]" or "administ[ers]" that established plan. 29 U.S.C. §§ 1002(1), (2)(A), (21)(A).

ComEd submits that ERISA's plan-specific nature means that an employer-administrator speaks as a fiduciary *only* when it speaks about new benefits that come in the form of an *amendment* to an established plan under which the employer and employee have a preexisting fiduciary relationship, as opposed to when that employer-administrator speaks about benefits in a *new* plan. At times, the majority appears inclined to that view. *See supra* at 3. Such a limited review, however, is at odds with *Varity Corporation*, 516 U.S. 489. In *Varity*, officials deliberately misled Varity

employees, who were participants in an existing ERISA plan and in a fiduciary relationship with Varity regarding that plan (Plan 1), to transfer out of Plan 1 and into a new plan (Plan 2); this new plan was established in an under-capitalized subsidiary, which eventually went into receiver-ship. *Id.* at 499-501. The Supreme Court held that Varity was acting in a fiduciary status—specifically, it was "administer[ing]" Plan 1—when it made material misrepresentations regarding the future of plan benefits, which were found in Plan 2. *Id.* at 502-03. Turning to the common law of trusts to inform ERISA's plain language, the Court explained:

> The ordinary trust law understanding of fiduciary "administration" of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents. The law of trusts also understands a trust document to implicitly confer "such powers as are necessary or appropriate for the carrying out of the purposes" of the trust. Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an important plan purpose. After all, ERISA itself specifically requires administrators to give beneficiaries certain information about the plan. And administrators, as part of their administrative responsibilities, frequently offer beneficiaries more than the minimum information that the statute requires—for example, answering beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits. To offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity.

*Id.* at 502-03 (citations omitted). At the least, *Varity* stands for the proposition that, when a company such as ComEd becomes a fiduciary to an employee as to an ERISA "plan" (e.g., Plan 1), then its fiduciary duties of loyalty and care *can* attach to representations made regarding new plans under which the employer and employee do not have a pre-existing fiduciary relationship (e.g., Plan 2). *Varity* gave no hint, and neither have subsequent cases, that the critical distinction a court must draw in determining whether an employer-administrator spoke in a fiduciary status is whether the employer spoke about an "amendment" to an existing plan or to a "new" plan.

This interpretation also makes good sense. It would be intolerable to allow an employer-administrator to avoid the ramifications of its fiduciary status by simply attaching the label "new plan"—as opposed to "plan amendment"—to the subject of its misrepresentations. Furthermore, at least in the situation in which an employer-administrator is offering enhanced, sweetened benefits to induce early retirement or separation, the line between a plan "amendment" and a "new" plan is indeed blurry and easily distracts from the critical issue. The enhanced benefits can form the basis of a totally "new" plan; they can be added as "amendments" to an existing plan; or they can be part of a plan that "supplements" an existing plan. Regardless of the label, under *Varity*'s reasoning, the critical factor is that there is a nexus between the new benefits about which the employer speaks and the existing plan under which an employer-employee fiduciary relationship already exists. When an employer speaks about new benefits that are related to benefits in a plan under which the employer and employee already have a fiduciary relationship, under *Varity* and a slew of other cases, the employer speaks about the future of plan-related benefits and thus is speaking in a fiduciary capacity. *See*, *e.g.*, *id.* at 502 (intentional deceit regarding replacement plan made in fiduciary capacity); *Bins v. Exxon Co. U.S.A.*,

220 F.3d 1042, 1046, 1048 (9th Cir. 2000) (en banc) (repre-
sentations about "a lump-sum retirement incentive under
the Special Program of Severance Allowances," an "ERISA
welfare benefit plan" that was "in addition to regular re-
tirement benefits," can be violation of ERISA fiduciary duty);
*Berlin*, 858 F.2d at 1157, 1163 (representations about a new
severance plan, under which employees "generally could
receive, in addition to any pension or other unrelated ben-
efit, a separation pay allowance" and "additional medical
insurance coverage" can be violation of ERISA fiduciary duty).

At times, my colleagues appear to agree that representa-
tions about new benefits that have a nexus to benefits in an
existing plan in which the employer and employee are in a
fiduciary relationship constitute fiduciary acts under *Varity*,
regardless of how one labels the form in which the new
benefits are found (e.g., amendments, new plan, supplement
plan). *See supra* at 5 ("*Varity* shows that candid and
complete information is required if two plans are in exis-
tence, and the sponsor tries to persuade employees to give
up benefits under one in exchange for benefits of the
other."). However, they appear to envision an artificially
tight nexus between those new, future benefits and the
benefits in the existing plan. *See supra* at 3-4 (rejecting that
ComEd was operating as a fiduciary when it made misrep-
resentations to Mr. Beach because "the plan under which
Beach wants (and was awarded) benefits does not amend or
modify any of ComEd's other plans—nor did Beach have to
choose between its benefits and those of the plans in which
he was a participant. . . . [The VSP] does not amend,
supplement, or replace any other plan."). I cannot subscribe to
that limited view because it elevates form over substance.
It may produce a conceptual bright-line, but it does so at
the expense of limiting, as a practical matter, the effective-
ness of the Congressional policy choices embodied in the
statute. The facts of this case make the point starkly. At the
time of ComEd's misstatements about the VSP, Mr. Beach

was a participant in ComEd's retirement pension plan and its health-care plan, although he was not eligible for benefits under ComEd's retirement medical plan. *See supra* at 3. The benefits in the retirement plan and the health-care plan cannot be untied from the VSP, which offered, inter alia, severance pay that would supplement his pension benefits and health benefits that would replace, upon retirement, his benefits under the health-care plan. In this circumstance, *Varity* fully supports the conclusion that ComEd was "administer[ing]" the retirement pension plan and health-care plan, and thus acting in a fiduciary capacity, when it furnished Mr. Beach with misinformation about the new VSP, which, in essence, supplemented or amended his existing plans with further retirement benefits.[1] *See Varity*, 516 U.S. at 503 ("[T]he factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that [the employer-administrator] was acting as a fiduciary.").

Before this court, ComEd also advances a temporal argu-

---

[1] This is not to say that, once an employer becomes a fiduciary with respect to one plan, it becomes a "fiduciary for all purposes." *Supra* at 3. Compare the situation in this case to the following hypothetical. Imagine that an employer-administrator with respect to a "pension plan," 29 U.S.C. § 1002(2)(A), gathered employees, who were also beneficiaries of that retirement plan, to discuss a new "prepaid legal services" plan, *id.* § 1002(1). Imagine further that, in that meeting, the employer-administrator made material misrepresentations about the legal services plan. It would be difficult to say in that circumstance, that the employer's fiduciary status with respect to the retirement plan means that its statements regarding the *unconnected* legal services plan were made in a fiduciary capacity. Again turning back to *Varity*, it would be quite difficult to say that the employer was "administering" the "pension plan" when it made the misrepresentations.

ment to cabin its fiduciary status. ComEd argues that, "as a matter of law," no fiduciary obligations should arise until a new plan such as the VSP is under "serious consideration." Appellant's Br. at 34. My colleagues appear to be inclined to that argument, albeit in dicta. *See supra* at 6-7.

The "serious consideration" threshold arises from a group of cases from other circuits that have held that "material misrepresentations about a future plan offering do not constitute a breach of fiduciary duty unless the misrepresentations are made after the employer has 'seriously considered' the future offering." *Hockett v. Sun Co.*, 109 F.3d 1515, 1522 (10th Cir. 1997). A plan is under "serious consideration" when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1539 (3d Cir. 1996) ("*Fischer II*"). If the "serious consideration" litmus test were the appropriate one, Mr. Beach's claim would fail because at the time the relevant misinformation was communicated ComEd did not have a "specific proposal" for a severance package before senior management.

The "serious consideration" test is simply a line drawn in an attempt to balance "Congress' competing desires, in enacting ERISA, to safeguard employee benefit plans, and yet not make such plans so burdensome or threatening that employers would shy away from offering them." *Hockett*, 109 F.3d at 1522. The Tenth Circuit has elaborated:

> In our view, the [serious consideration test] appropriately narrows the range of instances in which an employer must disclose, in response to employees' inquiries, its tentative intentions regarding an ERISA plan. Employers frequently review retirement and benefit plans as part of ongoing efforts to succeed in a competitive and volatile marketplace. If *any* discussion by management regarding possible change

to an ERISA plan triggered disclosure duties, the employer could be burdened with providing a constant, ever-changing stream of information to inquisitive plan participants. And, most of such information actually would be useless, if not misleading, to employees, considering that many corporate ideas and strategies never reach maturity, or else metamorphose so dramatically along the way, that early disclosure would be of little value. Furthermore, requiring employers to reveal too soon their internal deliberations to inquiring beneficiaries could seriously "impair the achievement of legitimate business goals" by allowing competitors to know that the employer is considering a labor reduction, a site-change, a merger, or some other strategic move.

Even more importantly, we believe the [serious consideration] standard protects employees' access to material information without discouraging employers from improving their ERISA plans in the first place. As recognized by the Sixth Circuit, "[c]hanging circumstances, such as the need to reduce labor costs, might require an employer to sweeten its severance package, and an employer should not be forever deterred from giving its employees a better deal merely because it did not clearly indicate to a previous employee that a better deal might one day be proposed." Moreover, employers often decide to "sweeten" an early retirement plan only after the employer has determined that not enough employees are opting to retire under the existing one. "If fiduciaries were required to disclose such a business strategy, it would necessarily fail. Employees simply would not leave if they were informed that improved benefits were planned if workforce reductions were insufficient." Thus, precipitous liability could push employers in the direction of involuntary

lay-offs, a common alternative to early retirement inducements. The [serious consideration] standard minimizes this possibility.

*Id.* at 1522 (citations omitted).

The opposite view originated in the Second Circuit and has come to be known as the "materiality test." In *Ballone v. Eastman Kodak Co.*, 109 F.3d 117 (2d Cir. 1997), the Second Circuit rejected that "serious consideration of a future plan is a prerequisite to liability for misstatements regarding the availability of future pension benefits." *Id.* at 123-24. The key inquiry, that court explained, is whether misrepresentations are "material," and they are "material if they would induce reasonable reliance"; "serious consideration" is but one factor in that inquiry. *Id.* at 124-25. Courts that have rejected the "serious consideration" prerequisite for misrepresentations, and instead have adopted the "materiality" test, reflect the concern that the serious consideration prerequisite would give an employer-administrator "a free zone for lying" and misleading employees about the availability of a future plan that is just around the corner but not yet on senior management's desk for approval. *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 428 (5th Cir. 2003). Further, the courts note that this position is consistent with common-law trust principles as interpreted by *Varity*. *Id.* at 425 ("*Varity* does not suggest that the obligation not to misrepresent materializes near the end of a progression [of deliberations on a new plan], but rather implies that whenever an employer exercises a fiduciary function, it must speak truthfully.").

In my view, cases that have adopted this latter view reflect a far more profound appreciation of Congressional concerns in this area and a more realistic understanding of the practicalities of the situation. The circuits that have subscribed to this materiality test have held that an employer-administrator does not have a duty *affirmatively to*

*disclose* deliberations regarding a new plan absent "serious consideration" of that plan, *but* it cannot make material *affirmative misrepresentations* regarding a plan in formation but not yet under "serious consideration." *See id.* at 429-31; *Wayne v. Pacific Bell*, 238 F.3d 1048, 1055 (9th Cir. 2001). In short, these circuits hold that the employer-administrator can choose not to speak until a plan is under "serious consideration," but if it does speak, it cannot mislead.

The Fifth Circuit's opinion in *Martinez* convincingly explains that, among other reasons for this distinction, the business practicalities arguments underlying the "serious consideration" test have more force in the disclosure context than they do in the affirmative misrepresentation context. *See Martinez*, 338 F.3d at 429 ("Insisting on voluntary disclosure during the formulation of a plan and prior to its adoption would . . . increase the likelihood of confusion on the part of beneficiaries," who would be bombarded with notices, "and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it." (quoting *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278-79 (2d Cir. 1996))). However, this view also protects the employee by not giving the employer "a free zone for lying" before a specific proposal is presented for senior management's approval. *Id.* at 428. Finally, under this "materiality approach," it is important to remember that only *material* misrepresentations are actionable, and whether a plan is under "serious consideration" is a factor in the materiality inquiry. Thus, the suggestion that every minor discussion of a new plan would constitute a breach of a fiduciary duty and thus discourage plan amendments is not convincing.

In sum, I

> take the view that the proper course for an employer to follow is not to affect the employee's decision whether to retire in any way—not by lying to them

to induce them to retire before implementation of an enhanced early retirement program, nor by being forced to tip off the employees to its business strategies to aid them in taking best advantage of the company's future plans. This middle road will allow the company to make its business decisions without hindrance while prohibiting it from tricking its employees into retirement by making guarantees it knows to be false.

We believe the two views we have promulgated—that an employer has no affirmative duty to disclose the status of its internal deliberations on future plan changes even if it is seriously considering such changes, but if it chooses in its discretion to speak it must do so truthfully—coalesce to form a scheme that accomplishes Congress's dual purposes in enacting ERISA of protecting employees' rights to their benefits and encouraging employers to create benefit plans. As one commentator has explained:

> [A] limited duty can reasonably be imposed on fiduciaries to refrain from making, either in response to participant inquiries or at fiduciaries' own initiative, material misrepresentations. . . . Under such a standard, a fiduciary would not be prohibited from declining to comment on the prospect of future changes, or from making generalized statements to the effect that the plan sponsor always retains the right to amend a plan. [In this way,] businesses will not be unduly discouraged from adopting or amending early retirement, severance or other types of plans, and participants' interests can be adequately protected from material misrepresentations that are intended to induce conduct that is contrary to their interests.

*Id.* at 430-31 (quoting Edward E. Bintz, *Fiduciary Responsibility Under ERISA: Is There Ever a Fiduciary Duty to Disclose?*, 54 U. Pitt. L. Rev. 979, 998 (1993)).

## 2.

ComEd made affirmative representations to Mr. Beach. Employing the materiality test, I would uphold the district court's determination that the misrepresentations made to Mr. Beach were material. "Where an ERISA fiduciary makes guarantees regarding future benefits that misrepresent present facts, the misrepresentations are material if they would induce a reasonable person to rely upon them." *Ballone*, 109 F.3d at 122. In addition to considering the "serious consideration" given to a plan, the following factors are utilized in deciding materiality:

> [1] how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes, [2] the special relationship of trust and confidence between the plan fiduciary and beneficiary, [3] whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware . . ., and [4] the specificity of the assurance.

*Id.* at 125 (citations omitted).

Mr. Beach was repeatedly told that "absolutely" the company was not going to offer his department (Transmission & Distribution or T&D) a package and even if ComEd were considering a package, T&D would not be included. Statement of Uncontested Facts ¶ 70. Contrary to ComEd's assertions, these representations significantly "misrepresent[ed] the [then-]present status of internal deliberations." *Ballone*, 109 F.3d at 125. There is no evidence in the record that ComEd definitively had decided it *would not*, after

reorganization, offer a severance plan; indeed, there are not even any facts that would suggest that conclusion. *See id.* at 126 (explaining that misrepresentations are "statements that the employer knows to be false, or that have no reasonable basis in fact"). On the other hand, evidence supports that there was a possibility that the reorganization study in T&D would ultimately result in the offering of a severance plan to some employees in T&D. For example, it is undisputed that documents in the record indicate that, as of June 1997, the reorganization plan called for excess employees in T&D, and that between 1994 and 1997, ComEd dealt with excess employees through involuntary and voluntary severance packages on twenty to thirty occasions. Of course, the record supports that, at the time of the misrepresentations, there was a possibility that no severance plan would be offered in T&D, but as Mr. Beach explained: "ComEd does not explain how the *possibility* that a package might not be offered could render a specific assurance that a package for his department was an *impossibility* a truthful and complete statement of then existing fact." Appellee's Br. at 41.

Moreover, these misstatements were more than co-employee "mispredictions." *Ballone*, 109 F.3d at 125 ("Whereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where, as alleged here, the guarantee is supported by specific statements of fact." (citations omitted)). Mr. Beach was not given mere unadorned speculation regarding the company and its future benefits; rather, he was told specifically that *his department* would not, under any circumstances, be receiving a severance plan. *Cf. Martinez*, 338 F.3d at 431-32 (holding personnel employee's statement that " 'he had not heard anything at this time' " about a new package and "that 'Schlumberger was doing too good right now and they would not be offering any packages because they'd lose too many good people' " not actionable misrepre-

sentation, reasoning that "any reasonable listener would understand the statement to [the plaintiff] to have been no more than the unsupported speculation of a fellow employee"). Given the numerous, concrete assurances from several human resources staff, Mr. Beach understandably believed that the staff had not given him their *personal opinions* on the future, but that they had relayed to him the *fact* that ComEd had made a corporate decision that T&D would not be considered for a package. Further, the misrepresentations did not contain any indication of a lack of finality or that the decision was subject to change, *cf. Mathews v. Chevron Corp.*, 362 F.3d 1172, 1183 (9th Cir. 2004) (explaining that language such as "at this time" indicates a lack of finality that cannot support materiality and indicating the situation would be different if the employer-administrator told the employees it had "ruled out plan changes for the immediate future, when in fact it had not" (citations omitted)), and the record is without any indication that ComEd released "other information or statements" that rebutted or "tend[ed] to minimize the importance of the misrepresentation[s]." *Ballone*, 109 F.3d at 125.

At the end of the day, in a case such as this, materiality ultimately turns on whether the misrepresentations would induce a reasonable person in Mr. Beach's situation to rely or, in the words of the Third Circuit, the likelihood that the misrepresentations would mislead a reasonable employee in Mr. Beach's situation "in making an adequately informed decision about if and when to retire." *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993) ("*Fischer I*"). Although only a small percentage of T&D employees were ultimately offered the VSP, the undisputed evidence is that Mr. Beach left "his final commitment to retire open until the last possible day, June 19, 1997, in case there [sic] the chance for a *possible* VSP arose." Statement of Uncontested Facts ¶ 74 (emphasis added). Moreover, it is important to remember that, due to his wife's ailment, Mr. Beach had a special

need for the health benefits offered in the VSP. Finally, the probability of a severance plan being offered in T&D—like the twenty to thirty severance plans offered before by ComEd—was not so small that it reasonably could not have affected Mr. Beach's retirement calculation. Given the record in this case, the district court's determination of materiality should remain undisturbed. As the Second Circuit said in language that speaks directly to this case:

> Regardless of whether the employer is seriously considering altering its retirement plan, the employer's false assurance that future enhancements have been ruled out for some specific period can be decisive in inducing an employee to hasten retirement, rather than delay in the hope of receiving enhanced future benefits. This aspect of the assurance can render it material regardless of whether future changes are under consideration at the time the misstatement is made.

*Ballone*, 109 F.3d at 124.

One final issue remains to be addressed. It is undisputed that ComEd's employees did not intend to deceive Mr. Beach when they told him that no severance plan in T&D would be offered. ComEd argued to this court that this lack of scienter by ComEd's human resources representatives demands judgments in its favor, and the majority hints, in dicta, ComEd is correct. *See supra* at 2. However, importing the intent to deceive requirement—synonymous in tort law with fraud or deceit—into this type of ERISA fiduciary duty case lacks any grounding.

Although this court has cases that might be read to support such an intent requirement, *see Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 961 (7th Cir. 1998), and cases to refute it, *see Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590-91 (7th Cir. 2000), none of them are

compelling in this case because they did not consider specifically and definitively if and when an employee's state of mind is relevant to oral misrepresentations. *See Frahm*, 137 F.3d at 960. The courts that have considered the question with any specificity have rejected the invitation to graft onto ERISA's fiduciary duty provision fraud's scienter requirement. *See, e.g.*, *Mathews*, 362 F.3d at 1183; *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002); *Fischer I*, 994 F.2d at 135. The plain language of ERISA's fiduciary duty provision points in the opposite direction. 29 U.S.C. § 1104(a) is entitled "Prudent man standard of care," and its duty of care portion, § 1104(a)(1)(B), requires that the fiduciary discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters . . . ."

Turning to the common law of trusts to inform that plain language further weakens the suggestion that intent to deceive is necessary in a breach of fiduciary duty action under ERISA. *See Varity*, 516 U.S. at 496 (noting that ERISA's fiduciary duties "draw much of their content from the common law of trusts"). As the Ninth Circuit recently explained in rejecting a similar argument:

> Trust law imposes a duty, when dealing with the beneficiary on the trustee's own account, "to communicate to the beneficiary all material facts in connection with the transaction *which the trustee knows or should know*." RESTATEMENT (SECOND) OF TRUSTS § 173 cmt. d (1959) (emphasis added); *see also Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993) (looking to comment d of section 173 in stating that ERISA section 404's "duty to inform . . . entails . . . a negative duty not to misinform"). Thus, by holding Steelman and Chevron liable for the "reasonably foreseeable consequences of their misinforma-

tion," the district court accords with the common law of trusts that attaches liability for information the trustee "should have known."

*Mathews*, 362 F.3d at 1183. Finally, the requirement of subjective intent to deceive would effectively mean that employers-administrators have a mere duty to avoid committing fraud. "As the Supreme Court noted in *Varity*, such conduct can create liability even among strangers," and "ERISA requires more of a fiduciary in discharging such duties that he or she simply refrain from outright lying." *Hudson v. Gen. Dynamics Corp.*, 118 F. Supp. 2d 226, 246 (D. Conn. 2000).

To the extent ComEd's argument for requiring intent focuses only on the fiduciary plan administrator's non-fiduciary agents (i.e., the benefits representatives) and not the fiduciary itself, that too is unconvincing. First, this and other courts have held that an ERISA fiduciary can be liable for the misrepresentations of its non-fiduciary agents under the apparent authority doctrine. *See Bowerman*, 226 F.3d at 589 & n.11. The apparent authority doctrine focuses on the reasonable reliance of the employee; it is irrelevant to the subjective intent of the agent. *See Restatement (Third) of Agency* § 2.03 (T.D. No. 2 2001). Moreover, shielding fiduciary/principals from liability because their non-fiduciary agents were without knowledge or intent would allow an employer-administrator to keep benefits representatives "out of the loop" and then avoid liability by saying their agents responded "ignorantly but truthfully." *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1049 n.6 (9th Cir. 2000) (en banc) ("[I]t would not be a defense that supervisors were unaware of the status and thus responded ignorantly but truthfully to the employee's inquiry."); *Fischer I*, 994 F.2d at 135 ("These obligations cannot be circumvented by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement."). Furthermore, in this circumstance, it is not unreasonable to place the burden on the employer-admin-

istrator, the party with the information, to provide correct information to its front-line staff so that they do not mislead and injure employee beneficiaries.

For these reasons, I would hold that when an employer-administrator speaks—either directly or through its benefits representatives—it violates its fiduciary duties when it affirmatively misinforms a beneficiary knowing its statement is false, when it recklessly misinforms not knowing whether its statement "is true or not," and when it misinforms under circumstances indicating it should have known the falsity of its statement. *Wayne v. Pacific Bell*, 238 F.3d 1048, 1055 (9th Cir. 2001). This is not a "duty of prevision" or a "standard of absolute liability," *Frahm*, 137 F.3d at 960; rather, it is a standard which is consistent with the common law of trusts, consistent with our fellow circuits, and, in my opinion, appropriately balances the relative interests ERISA was intended to oblige. In this case, this standard is easily satisfied: ComEd's human resources personnel had absolutely no basis for their misrepresentations; at the least, they should have known better.

For all of these reasons, I would uphold the district court's conclusion that ComEd violated its fiduciary obligations to Mr. Beach through its material misrepresentations. I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*